# United States Court of Appeals
## For the First Circuit

No. 24-1052

UNITED STATES OF AMERICA,

Appellee,

v.

DARIO GIAMBRO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Rikelman, Lynch, and Aframe,
Circuit Judges.

Edward S. MacColl, with whom Marshall J. Tinkle and Thompson, MacColl & Bass, LLC, P.A. were on brief, for appellant.

Brian S. Kleinbord, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

January 15, 2025

**RIKELMAN**, <u>Circuit Judge</u>. Dario Giambro appeals his conviction under 18 U.S.C. § 922(g)(1), the felon-in-possession statute, on two grounds. First, Giambro argues that the district court erred in denying his motion to suppress evidence found by police officers after they forcibly entered his Hebron, Maine home without a warrant. The district court concluded that the entry fell within the emergency aid exception to the Fourth Amendment's warrant requirement, which would apply here only if the officers had an objectively reasonable basis to believe that Giambro's wife, Arline, was inside the couple's home and in need of immediate aid. Giambro argues that the exception cannot apply because the information reported by Arline's family to the police officers was exactly the opposite: that Arline was not in the home and that she had died at least one day earlier. Second, he argues that the district court erred in denying his motion to dismiss the charge against him on Second Amendment grounds.

We agree with Giambro that the officers' entry into his home cannot be justified under the emergency aid exception to the warrant requirement and thus violated his Fourth Amendment rights. Considering the record facts here, there was no objectively reasonable basis for the officers to conclude that they needed to enter the home to render emergency assistance to Arline. Further, the officers conducting the search knew that Arline's adult son and husband were nearby and available for questioning immediately

before the warrantless entry, yet they never tried to speak to the family members.  We conclude that officers may not ignore obvious and available options for gathering facts to determine if an emergency actually exists.  Accordingly, we reverse the district court's denial of Giambro's motion to suppress the evidence used against him and remand for further proceedings.  Given our ruling on the Fourth Amendment issue, we do not reach Giambro's Second Amendment claim.[1]

## I.  BACKGROUND

The events leading up to the warrantless entry and search of Giambro's home began when Antonio, his son,[2] visited his parents' trailer in Hebron, Maine on the morning of January 26, 2022.  Antonio had returned from a week-long vacation the day before and, understandably, wanted to check on his parents, both of whom were in their seventies.  After arriving in Hebron, Antonio spoke to his father inside the trailer, and his father told him that his mother had died while Antonio was on vacation.  During their conversation, Antonio became concerned about his father's mental health and decided to drive him to a hospital in a nearby town, about 15 minutes away.  Importantly, Antonio did not see his

---

[1] At oral argument, Giambro agreed that if we reverse the district court's Fourth Amendment ruling, we need not address his Second Amendment claim.

[2] To avoid confusion, we refer to Giambro's wife and son by their first names; we mean no disrespect in doing so.

- 3 -

mother inside his parents' trailer that morning. Antonio also did not call 911 or take any other steps indicating that he was worried that his mother was still alive and in need of aid.

Instead, the hospital where Antonio brought Giambro called the police and asked for an officer to respond to the hospital. At noon, about 45 minutes after that initial call by the hospital, police officers broke into Giambro's home without a warrant. The underlying facts about what transpired on January 26 come from hearing testimony on Giambro's motion to suppress. We recite those facts as found by the district court.

## A. Initial Entry into the Hebron Trailer

At about 11:12 a.m. on January 26, the Oxford County Regional Communication Centers Dispatch ("Dispatch") received a non-emergency call from Stephens Memorial Hospital (the "Hospital") in Norway, Maine. A Hospital employee requested that an officer come to the Hospital. The employee recounted that an individual (Antonio) had "just brought in his father to the hospital because [his father] is confused but he said that his mother is at the house deceased and . . . they don't know what happened to the mother." Dispatch then spoke to Corporal Robert Federico, an officer from the Norway Police Department, and relayed that "Antonio Giambro brought his dad Dario Giambro in who is ill and is stating that the mother is at their residence. I don't

- 4 -

have that information.  She is deceased and they are not sure what happened."  Cpl. Federico then proceeded to the Hospital.

Ten minutes later, Cpl. Federico arrived at the hospital and spoke with Antonio in the lobby of the emergency department while Giambro waited in Antonio's car.  As the district court summarized, Antonio relayed the following information to Cpl. Federico:

> [Antonio] had recently returned from vacation and, the night prior, had gone to plow the snow outside the residence of his parents, Dario and Arline Giambro ("Arline"), in Hebron ("the residence").  However, he was unable to make contact with either of them despite knocking on the front door of the residence and calling throughout the evening.  It was not until the following morning, January 26, that Dario answered the phone.  Because Dario sounded "off" during that phone conversation, Antonio again traveled to his parents' residence.  Once there, Antonio did not see his mother (and Dario's wife), Arline, but spoke with Dario.  Dario commented that Arline had died while Antonio had been away on vacation.  When Antonio attempted to inquire as to what specifically had happened to Arline, Dario would offer only cryptic or evasive answers to the effect of "she didn't wake up" and "these sorts of things happen."  Antonio asked whether any ambulance or police had been by the house, and Dario responded that they had not.  He also asked where Arline's body was, and Dario responded that she was not in the house and that they lived "on a homestead."  Antonio told his father that he would take him to lunch but instead brought him to Hospital.

United States v. Giambro, No. 2:22-CR-00044, 2023 WL 3123001, at *2 (D. Me. Apr. 27, 2023) (summarizing testimony of Cpl. Federico).

- 5 -

After speaking with Antonio for about five minutes, Cpl. Federico reached back out to Dispatch. At 11:26 a.m., Cpl. Federico informed Dispatch that the residence at issue was in Hebron and that "the father is telling the son that the mother died but she's not in the house and he won't say where she is." He suggested that Oxford County, which had jurisdiction over Hebron, "may wish to have a deputy come here to talk to him." Thus, Cpl. Federico requested that an Oxford County deputy come to the Hospital to speak to Giambro (or Antonio). Dispatch responded that they would "let the . . . deputy know and have somebody go there and meet with him."

Several minutes later, Cpl. Federico called Dispatch again and stated: "Oxford just may want to let the deputy know that the subject has multiple comments in his [names] file, they might want to review that." A "names file" is a computerized record that allows local law enforcement to enter and view comments about an individual. On the morning of January 26, Giambro's names file contained two "miscellaneous comments" that were both more than a decade old: (1) that "GIAMBRO has shot a subject, created a police standoff, is VERY anti-law enforcement and in the past has possessed more than 100 firearms," dated May 29, 2010, and (2) that "[s]ubject [is] on [f]ederal [p]robation with Mat Brown. Brown thinks subject could be a problem with [law enforcement officers]. Brown also thinks subject is armed. Mat does not have

- 6 -

search conditions on subject but is going to try and get that changed," dated November 18, 2008.

Cpl. Federico contacted Dispatch for a third time to request that the deputy "give[] me a call [so] I can explain better, I just don't want to put it out over the air." Cpl. Federico then spoke via his personal cell phone to Deputy Brandon Tiner of the Oxford County Police Department. Cpl. Federico and Deputy Tiner discussed "everything [Cpl. Federico] had learned up to that point as far as what Antonio had told [him]," the comments in Giambro's names file, and their concerns that Arline may still be alive.

Deputy Tiner did not go to the Hospital as Cpl. Federico had requested through Dispatch; instead, he proceeded directly to the Giambro property, located in Hebron, Maine. Two other officers from the Oxford County Police Department met him there, as well as one additional officer from the Maine State Police Department. All four arrived at Giambro's home in Hebron between 11:46 a.m. and 11:54 a.m.

Located on the Giambro property were "[a] beige brown trailer domicile which [could] not be seen from the road" and "[o]utbuildings [including] a large metal two bay garage." Two officers walked around the back of the trailer to look for any tracks in the snow but did not see any. The officers attempted to look through the trailer's windows, but blinds and plastic obscured

their view. One officer looked through the garage windows but did not see anybody inside. He also knocked on the trailer's door, yelled "Sheriff's Office," and repeatedly instructed anyone inside to answer the door.[3]

At this point, the only information the officers had received about Arline was that she had died. The officers also knew "that [Antonio] had been at the house that morning," that "he had not made any emergency calls to law enforcement or ambulance [services]," and that "instead of doing those things, [Antonio] decided to take his dad to the hospital." Nevertheless, the officers remained concerned that Arline was "unaccounted for." To attempt to verify Arline's condition, they reached back out to Dispatch, which confirmed that no medical calls or requests for assistance had been made on Arline's behalf. The officers made no efforts, however, to discuss their concerns that Arline may still be alive with her family members, even though Antonio and Giambro remained at the Hospital with Cpl. Federico and were readily available to the officers via Cpl. Federico's cell phone immediately before and during the search.

---

[3] The dissenting opinion suggests that the officers conducted a thorough search of the property before forcibly entering the home. But the record indicates only that the officers looked in through the windows of the garage and briefly checked around the trailer for footprints in the snow. After they broke into the trailer and did not find Arline, the officers continued their search, including by inspecting the "exterior perimeter of the garage." See infra Section B.

At around 11:57 a.m., two officers decided to force open the door of the trailer. Once inside, the officers walked through the kitchen/living area, the hallway, and a bedroom off the hallway. They also forced open an interior locked door. The officers did not locate Arline but did observe many firearms in plain view throughout the trailer, as well as behind the locked door. The officers exited the trailer at around 12:05 p.m. The search concluded without any officer at the site ever speaking to Antonio or Giambro.

## B. Discovery of Arline's Body

Soon after, one officer departed and the others continued to search the area surrounding the trailer. As one of the remaining officers was attempting to open the garage door, another officer stepped over a snowbank at the edge of the driveway and observed old tracks in the snow on the other side. He followed the tracks and found an unhinged door lying on top of the snow. Underneath the door was a body-sized object wrapped in cloth and plastic, which was later determined to be Arline's body. An autopsy revealed she had died of natural causes.[4]

---

[4] The suppression record indicates that, while at the Hospital, Antonio had spoken to Cpl. Federico about whether local law would permit individuals to bury deceased family members on family property, in a homestead burial.

## C. Search Warrant and Indictment

That same evening, the Maine State Police applied for a search warrant for the Giambro property, including the trailer and garage. The officers' earlier search of the property, including the firearms and ammunition they observed after entering the trailer, was the only basis for their warrant request. In executing the warrant, the government seized firearms and ammunition. Ultimately, Giambro was indicted on one count of possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a).[5]

## D. Motion to Suppress

Giambro timely moved to suppress the firearms seized from his trailer as the fruits of an illegal search. The district court conducted an evidentiary hearing on the motion, and Cpl. Federico and two of the officers who conducted the warrantless entry testified for the government.[6] The government did not call Deputy Tiner as a witness, even though he was the only officer

---

[5] Giambro had previously been convicted of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d), a crime punishable by imprisonment for a term exceeding one year, see id. § 5871.

[6] The government presented one additional witness, Oxford County Police Officer Adam Fillebrown. Officer Fillebrown had reported to the Hospital and later accompanied Antonio and Giambro to the Oxford Police Department for an interview, but he did not communicate with any of the four officers who entered Giambro's home.

conducting the search who had spoken directly to Cpl. Federico that morning.

During the hearing, the officers recounted what they knew about Arline's condition at the time of their warrantless entry into Giambro's home. One of the officers, Lt. Chancey Libby, admitted that he had not been told anybody was alive or in need of medical attention at the home, and that he knew that Antonio had been inside the trailer earlier that morning and had placed no calls requesting emergency assistance.

The second officer, Sgt. Daniel Hanson, explained that he had been briefed on the situation by an officer from the Maine State Police Department. That officer

> advised [Hanson] that a subject had gone to check on his parents, had found his father at the residence, found his father ill, could not find his mother, and brought his father to the hospital. His father had relayed to him that his mother was deceased but did not give any indication of where she was and didn't advise him of where she was.

When asked by counsel why none of the officers had contacted Giambro before entering the trailer, Sgt. Hanson responded that although it "would be assumed that [Giambro] would know" where Arline was located, asking Giambro "wasn't something that I had thought of at that point in time."

Sgt. Hanson also testified that he had received information about a possible homicide. But he quickly explained

- 11 -

that this information was shared in an earlier conversation, before all the facts were communicated, and he denied any basis for believing a crime had occurred before he entered the trailer that morning.

For his part, Lt. Libby testified that he knew "nothing" about reports of a homicide.

### E. District Court's Order

The district court denied Giambro's motion to suppress. It concluded that the officers properly relied on the emergency aid exception in entering Giambro's home without a warrant so that they could confirm that Arline was no longer alive. Giambro, 2023 WL 3123001, at *5. The court explained:

> [L]aw enforcement received information from Defendant's own son, Antonio, that his mother (Defendant's wife) was missing and that Defendant was acting strangely. Antonio also reported that Defendant offered only evasive and cryptic answers in response to inquiries about his mother's whereabouts but also indicated she had died without providing the location of her body. Viewing these facts objectively, the Court finds that a reasonable officer could have understood Defendant's evasiveness and shifting statements about his elderly wife's whereabouts -- coupled with her unexplained absence -- as an indication that she was potentially in danger and in need of immediate aid.
>
> Additionally, because the officers knew that Defendant and Arline resided together at the residence, the officers had a reasonable basis to believe that they would locate her there.

Id. at *4 & n.20.

Giambro timely appealed the district court's rulings denying his motion to suppress and his motion to dismiss the indictment.

## II. STANDARD OF REVIEW

"When reviewing a challenge to the district court's denial of a motion to suppress, [w]e view the facts in the light most favorable to the district court's ruling . . . , and we review the district court's findings of fact and credibility determinations for clear error." United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) (quotation marks and citation omitted). We review de novo the district court's ultimate legal conclusion that the emergency aid exception justified the officers' warrantless entry into Giambro's home based on the record facts. See United States v. Almonte-Báez, 857 F.3d 27, 31 (1st Cir. 2017).

## III. DISCUSSION

Giambro argues that the district court legally erred in concluding that the emergency aid exception was met here. And because the officers invoked the exception to justify the warrantless entry that led to their discovery of the firearms, Giambro contends the evidence seized by the officers in their subsequent search must be suppressed.

### A. Emergency Aid Exception

To explain why we agree with Giambro, we lay out the

legal standard governing the emergency aid exception. The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" Kyllo v. United States, 533 U.S. 27, 31 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). It follows that "searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (quoting Groh v. Ramirez, 540 U.S. 551, 559 (2004)).

"Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Id. The United States Supreme Court has identified the need to render emergency aid as one such exception, explaining that "the need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal." Id. (quoting Mincey v. Arizona, 437 U.S. 385, 392 (1978)). "Thus, law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" Michigan v. Fisher, 558 U.S. 45, 47 (2009) (quoting Brigham City, 547 U.S. at 403).

To justify warrantless entry under the emergency aid exception, it is the government's burden to establish an "'objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid.'" Id. (first quoting Brigham City, 547 U.S. at 406; and then quoting Mincey, 437 U.S. at 392).[7] The government must justify its belief as to (1) the existence of an emergency and (2) the reason "for linking the perceived emergency with the area or place into which [the officers] propose to intrude." United States v. Martins, 413 F.3d

---

[7] The dissenting opinion mistakenly suggests that the critical question under this legal standard is whether officers can wait the several hours it would take to obtain a warrant before entering a home to conduct a search. But that analysis applies only in an ordinary exigent circumstances case, where the police have probable cause to believe a crime has been committed -- a belief expressly disclaimed by the testifying officers here -- but not enough time to obtain a warrant because, for example, they are in "hot pursuit of a felon" or faced with the "imminent destruction or removal of evidence." Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000). It is not the correct analysis in this case. Indeed, although the dissent points to Justice Alito's concurrence in Caniglia v. Strom, 593 U.S. 194, 200 (2021) for support, the concurrence says the opposite. It notes that in many situations where police seek to invoke the emergency aid exception, a warrant could never be obtained because the police are not investigating a crime, "and warrants are not typically granted for the purpose of checking on a person's medical condition." See id. at 203 (Alito, J., concurring). Thus, to rely on the emergency aid exception, the government must show that the officers who forcibly entered the trailer had a reasonable basis to believe that a person inside the home needed emergency aid at that time. See Fisher, 558 U.S. at 47; Brigham City, 547 U.S. at 403.

- 15 -

139, 147 (1st Cir. 2005), <u>abrogated in part by</u> <u>Hill</u> v. <u>Walsh</u>, 884 F.3d 16, 23 (1st Cir. 2018).[8]

## B. Analysis

Accepting the facts as found by the district court, we conclude as a matter of law that the government failed to carry its burden to establish that the emergency aid exception justified the officers' warrantless entry into the Hebron trailer.[9] We part ways with the district court's analysis because the key facts the officers had before entering the trailer indicated that (i) Arline had died and (ii) she was not inside the trailer. Thus, although we well understand the officers' subjective concerns, on these facts, it was not objectively reasonable for them to enter the home without a warrant, at least not without first speaking to Arline's available family members. That is especially so given that Antonio had been inside the home that very morning.

---

[8] <u>Martins</u>, which was decided before <u>Brigham City</u> and <u>Fisher</u>, held the officers to a standard of proof approximating probable cause. <u>See</u> 413 F.3d at 147. <u>Hill</u> later rejected that standard of proof. <u>See</u> 884 F.3d at 23 (holding that "objectively reasonable basis" "need not approximate probable cause" (quotation marks omitted)).

[9] The dissenting opinion suggests that we have failed to credit the district court's factual findings, but that is not correct. To the contrary, we rely on those findings and credit them fully. We disagree only on the legal question of whether those facts are sufficient to demonstrate that the emergency aid exception applies.

We evaluate each prong of the emergency aid exception in turn.

## 1. There Was No Evidence of an Ongoing Emergency

For a search to qualify for the emergency aid exception, there must be an emergency. Framing the critical legal question in terms of the facts of this case, a forced, warrantless entry into Giambro's home would have been justified only if the police officers had a reasonable basis to believe that Arline was alive and in need of assistance. See Fisher, 558 U.S. at 47. We conclude there was no such reasonable basis here because the facts communicated to the police were exactly the opposite: that Arline had died at least one day earlier.

To be sure, the officers knew that when Giambro told his son that Arline had died, Giambro seemed confused and said only that Arline "didn't wake up" one morning and that her body was not in the house. But the report of a death, standing alone, does not support a reasonable belief in an urgent, ongoing emergency. See United States v. Richardson, 208 F.3d 626, 631 (7th Cir. 2000).[10]

---

[10] In Richardson, the U.S. Court of Appeals for the Seventh Circuit explained that, generally, "[f]aced with a report that there is a corpse in a house, it is hard to see why it is objectively reasonable to search in the hopes of finding a person who is still alive." 208 F.3d at 631. That said, after noting that "[w]e find this a very close case," the court held that it was objectively reasonable for officers to conclude there were "exigent circumstances on the[] particular facts" there. Id. at 631. Those facts included that the police had received a 911 call

- 17 -

Again, although we understand the officers' concerns, there simply were no facts suggesting that Arline might still be alive. Most importantly, as the officers knew, Arline's adult son Antonio had been in his parents' home just hours earlier, and, upon learning his mother had died while he was on vacation, did not demonstrate any anxiety that his mother could still be alive and in need of aid.[11] Instead, Antonio showed concern about his father's mental health and drove his father to a hospital 15 minutes away.

On top of Antonio's actions that morning, the officers knew that neither law enforcement nor medical personnel had been summoned to the Giambro property in the days leading up to the warrantless entry: There had been no calls for emergency aid from Giambro or Arline, and nobody had requested a welfare check. Cf. Caniglia v. Strom, 593 U.S. 194, 207-08 (2021) (Kavanaugh, J., concurring) (reasoning that a scenario in which a "concerned

---

from someone who identified himself by name, id. at 630; the caller reported a "rape[] and murder[]" and specified that the alleged victim could be found in the basement of the address he gave the officers, id. at 627-28; and "[t]his [was] not a case where the report indicated the body had been languishing in the house for several days," id. at 631. None of those facts are present here.

[11] Indeed, when officers finally asked Antonio and his father further questions after they broke into the trailer, Antonio told them that his mother had been ill for a long time, that his father had been caring for her, and that Antonio had no doubt Arline was deceased. Given that the officers did not know these facts before the search, however, we rely only on Antonio's actions on the morning of January 26.

relative calls the police and asks the officers to perform a wellness check" could give rise to emergency aid exception); Gaetjens v. City of Loves Park, 4 F.4th 487, 490 (7th Cir. 2021) (holding that warrantless search was lawful where neighbor called police because she was concerned that missing woman was experiencing medical emergency). Finally, there were no signs of recent violence or disturbance at the Giambro residence when the officers arrived at the property. Cf., e.g., Brigham City, 547 U.S. at 400-01; Fisher, 558 U.S. at 48 (upon arrival to the scene, officers "encountered a tumultuous situation" and "signs of a recent injury"); United States v. Maxwell, 85 F.4th 1243, 1245 (7th Cir. 2023) (officers responded to reports of gunshots and saw "bullet holes in [the apartment's] front door," prompting them to fear for a potentially injured occupant).

Instead, Deputy Tiner proceeded to Hebron, rather than to the Hospital as Cpl. Federico had suggested, only after reviewing the information in Giambro's names file. But the comments that Cpl. Federico had flagged for Deputy Tiner in the names file were over twelve years old, and they did not discuss Arline or Giambro's relationship with Arline. The comments did describe Giambro's past interaction with law enforcement, including his prior use of force against another man who came uninvited to his property, and the potential that he still owned firearms. But no officer even implied at the suppression hearing

that those facts were relevant to their concerns about Arline on January 26; to the contrary, both Sgt. Hanson and Lt. Libby denied any basis to believe a crime had occurred. As Sgt. Hanson summed it up, "we had no crime."

Finally, we view one last fact as critical here. To the extent that the officers had questions about Arline's well-being, her adult son and husband were with a police officer, Cpl. Federico, immediately before the warrantless entry and available for questioning. See Hopkins v. Bonvicino, 573 F.3d 752, 765 (9th Cir. 2009) ("[I]f [police officers] otherwise lack reasonable grounds to believe there is an emergency, they must take additional steps to determine whether there [i]s an emergency that justifie[s] entry in the first place.") (quotation marks and citation omitted). And there is no indication in the record that Antonio was uncooperative or evasive with Cpl. Federico.

We do not mean to suggest that law enforcement must conduct additional investigation if the facts on hand already indicate an objectively reasonable basis to invoke the emergency aid exception. Cf. Deaton v. Town of Barrington, 100 F.4th 348 (1st Cir. 2024) ("[O]nce police officers are presented with probable cause . . . , no further investigation is required at that point." (quoting Forest v. Pawtucket Police Dep't, 377 F.3d 52, 57 (1st Cir. 2004))). We merely emphasize that officers may not ignore obvious and available options for gathering facts to

determine if an emergency actually exists.  See Hopkins, 573 F.3d at 765.

The government nevertheless argues that a report of a dead body can justify warrantless entry into a residence.  We appreciate the variety of factual circumstances law enforcement may face, but the government's argument cannot be squared with Supreme Court precedent regarding the emergency aid exception, which focuses on providing aid to an individual who is "seriously injured or threatened with such injury."  Fisher, 558 U.S. at 47.  The Supreme Court has been cautious about expanding the scope of exceptions to the warrant requirement, most recently by holding that law enforcement's general community caretaking functions do not merit such an exception.  See Caniglia, 593 U.S. at 199 (quoting Collins v. Virginia, 584 U.S. 586, 596 (2018)); see also Mincey, 437 U.S. at 394-95 (rejecting a "murder scene exception").

Instead, we reiterate that the emergency aid exception justifies warrantless entry only in the narrow set of circumstances when law enforcement must "render emergency assistance to an injured occupant or . . . protect an occupant from imminent injury."  Fisher, 558 U.S. at 47.  And a report that someone has died cannot always satisfy this standard because the report of a death generally indicates that emergency assistance is no longer needed. See Richardson, 208 F.3d at 631.

The cases the government cites are not to the contrary because in each case law enforcement either entered a home for other reasons or had information that reasonably led them to believe an individual could still be alive and in need of immediate aid. For example, in United States v. Beaudoin, a 911 caller described "a drug deal gone bad at the Kozy 7 Motel, Room 10" and reported that "there [wa]s a dead body in there." 362 F.3d 60, 62 (1st Cir. 2004), cert. granted, judgment vacated on other grounds sub nom. Champagne v. United States, 543 U.S. 1102 (2005). But by the time the officers entered the motel room without a warrant, they did so based on a far more developed set of facts: the defendant voluntarily opened the door to his motel room to speak with the officers; the officers questioned the defendant and discovered he was carrying weapons and drug paraphernalia; and the officers observed a second man through the open door who may have been "searching for a weapon or trying to hide evidence." Id. at 63-64. Ultimately, we concluded that the officers' warrantless entry was justified due to the officers' fears for their own safety and did not rely on the report of the 911 caller as critical to our Fourth Amendment analysis. Id. at 71 (declining to "adopt[] a broad emergency aid doctrine").

Next, in United States v. Stafford, a fire alarm technician entered an apartment covered in blood, feces, and hundreds of hypodermic needles; he contacted maintenance because

he became concerned "there might be a dead body" inside the unit; and the maintenance person in turn told the property manager, who called the police. 416 F.3d 1068, 1071-72 (9th Cir. 2005) (emphasis added). The U.S. Court of Appeals for the Ninth Circuit held that on these facts, the report of a "possible dead body" was sufficient to justify warrantless entry. Id. at 1071.

Finally, in Wayne v. United States, police received an emergency call reporting an "unconscious woman" at an apartment. 318 F.2d 205, 211 (D.C. Cir. 1963). The call was placed at the request of the woman's sister. Id. at 207. On this information, the officers "could not assume the woman was dead" rather than critically injured and so were justified in entering the apartment to attempt to render aid. Id. at 212-13.

To be sure, "[e]ven the apparently dead often are saved by swift police response," and officers should not be forced to choose between saving a life and violating the Constitution. Id. at 212. But there were simply no facts in this case indicating that Arline might still be alive, and thus no objectively reasonable basis for believing that she was. Thus, the government failed to carry its burden to meet the first prong of the emergency aid exception.

The dissenting opinion's conclusion to the contrary rests on three critical errors. First, the opinion misstates the record. The dissent's suggestion that the officers conducted the

warrantless search because they had reason to believe that Arline was a victim of domestic violence is incorrect. There is no evidence in the suppression record to support this claim. In fact, the record conclusively refutes it. None of the officers said a word about domestic violence at the suppression hearing, and instead they testified consistently that they had no basis to believe that a crime had been committed before they entered Giambro's home.

To be clear, it is not just that the suppression record does not mention domestic violence "in so many words," as the dissent suggests; it is that the record contains nothing at all indicating that suspicions of domestic violence motivated the search. If concerns about domestic violence had played any role that day, one would have expected the issue to dominate the suppression hearing from beginning to end, but there was no mention of it. The dissenting opinion also points to Giambro's two-page names file, but the names file says nothing about domestic violence or Arline. It does list a welfare check at the Giambros' home in 2021, but neither the names file itself nor any other part of the record indicates that the welfare check had anything to do with

domestic violence.[12]  And the district court certainly made no such finding.

Critically, the government has disavowed the dissenting opinion's domestic violence theory to justify the search.  It has never suggested, either to the district court or to us, that domestic violence concerns prompted the search of the Giambro home.  To the contrary, the first and only time the domestic violence theory was raised in this case was when the panel asked the government about it at oral argument, and the government forthrightly rejected it, stating that there was nothing in the suppression record about "domestic violence or anything like that."[13]

_____

[12] The dissent's suggestion that Sgt. Hanson and Deputy Tiner had reason to believe that Arline was a victim of domestic violence rests on speculation.  Neither officer voiced such a concern.  Sgt. Hanson testified at the suppression hearing and said nothing about domestic violence.  Deputy Tiner did not even testify, and there is no affidavit or other statement from him in the suppression record.  And the brief testimony by Cpl. Federico and Sgt. Hanson about their conversations with Deputy Tiner that morning, on which the dissent seems to rely, does not mention any domestic violence concerns.  See supra p. 7.

[13]  In footnote 28, the dissent also refers to Arline's statements from the 1980s, which were mentioned in Giambro's Presentence Investigation Report (PSR) -- a document that did not exist at the time of the search or the suppression hearing and was created nearly two years after the search.  (The PSR also contains Antonio's statement that although his parents argued and pushed each other when he was little, he had not seen "anything like this in years.")  As the dissenting opinion acknowledges, the officers conducting the search did not know the contents of the PSR.  Thus, the PSR cannot possibly support the "reasonableness" of any actions by Deputy Tiner leading up to the search.  It is black-letter law

Second, the dissenting opinion relies on cases that undermine its conclusion or rest on facts that are just not present here. For example, the dissent relies repeatedly on concurring opinions in Caniglia. But Caniglia reversed a decision by our court upholding a warrantless search and held that the general community caretaking functions of law enforcement do not justify warrantless entries into the home. 593 U.S. at 198-99. The dissent also contends that Brigham City approved the analysis of a concurring opinion in Wayne. But Brigham City's only reference to Wayne is to cite it indirectly for the basic rule that the need to preserve life or avoid serious injury can justify a warrantless search. See Brigham City, 547 U.S. at 403 (citing Mincey, 437 U.S. at 392; and then citing Wayne, 318 F.2d at 212).

Similarly, the dissenting opinion cites cases in which officers did have an objectively reasonable basis for concluding there was an emergency. But the facts that were critical to the outcomes of those cases are not present in this case.[14] For

_____

that a court cannot rely on "post-entry information . . . to 'cinch' or 'strengthen' [a] finding that the officers reasonably believed" they had a basis for a warrantless search. United States v. Young, 835 F.3d 13, 20 (1st Cir. 2016) (citing Payton v. New York, 445 U.S. 573, 590 (1980); and then citing United States v. Graham, 553 F.3d 6, 14 (1st Cir. 2009)).

[14] Because the facts of these cases are so different, and given the fact-dependent nature of the emergency aid exception analysis, our holding in no way creates a circuit split, contrary to the suggestion in the dissenting opinion.

- 26 -

example, when officers arrived at the Giambro residence, there were no signs of violence or disturbance.  Nobody called the police and nobody reported hearing screams or threats.  Contra United States v. Guillen, 755 F. App'x 643, 645 (9th Cir. 2018); Harrison v. Davidson Hotel Co., 806 F. App'x 684, 686 (11th Cir. 2020).  And although the dissenting opinion asserts that our holding is irreconcilable with Hill and the reasoning of Justice Kavanaugh's concurrence in Caniglia,[15] we disagree.  In Hill and the hypothetical situations discussed by Justice Kavanaugh (as well as in Wayne), a relative or neighbor asked officers for assistance, expressing concern for a person who was unaccounted for and whose health status was either unknown or unstable.  See also Gaetjens, 4 F.4th at 490.  The exact opposite is true here: No relative or neighbor asked for police assistance or expressed concern that Arline might need emergency aid.  Thus, the critical facts that could justify invoking the emergency aid exception in those situations are precisely the facts that are missing here.

Third, although the dissenting opinion admits that the legal standard requires courts to evaluate what the officers knew at the time of the search, it fails to apply that standard.  According to the dissent, the facts at the time of the search were "ambiguous at best."  But pointing to ambiguity is not enough to

---

[15] We put to the side that Justice Kavanaugh was writing only for himself in his concurring opinion.

meet the government's burden to demonstrate an objectively reasonable basis for believing a person inside Giambro's home needed immediate aid. And that is precisely why the officers should not have proceeded with a forced, warrantless entry that morning, especially when they had an obvious and available option for gathering additional information: speaking to Antonio, who had been inside the home just hours earlier.

**2. There Was No Evidence that Arline Was Inside the Trailer**

The second requirement of the emergency aid exception is that officers have an objectively reasonable basis to believe that an individual who needs emergency aid is in the place that they decide to search. See Martins, 413 F.3d at 147. Here, all the available facts indicated that Arline was not in the trailer.

As the district court found, Antonio had been inside the trailer that very morning and had not seen his mother, even though the trailer was not a large home. Giambro, 2023 WL 3123001, at *1. And Giambro told Antonio that Arline's body "was not in the house." Id. The officers knew these facts before entering the trailer, and they had no information to the contrary.

The government points to several facts in the record that it contends support the officers' decision to search the trailer. It notes that Giambro was confused and would not directly answer Antonio's questions regarding Arline's death, and Arline lived in the trailer and reportedly had died in her sleep. It

- 28 -

also emphasizes, understandably, that Arline's body was unaccounted for according to Antonio. But the difficulty with the government's argument is that Arline was unaccounted for precisely because Antonio had not seen her inside the trailer that morning and because Giambro would say only that she was not in the house.[16] So, again, the actual facts before the officers indicated that of all the places Arline could be on the Giambro property, she was not in the trailer. See United States v. Timmann, 741 F.3d 1170, 1181 (11th Cir. 2013) (concluding that "it was not reasonable for the officers to believe that someone inside Timmann's apartment was in danger and in need of immediate aid" when officers had no evidence of any ongoing emergency or disturbance inside the apartment).

The government relies on Hill v. Walsh to argue that when officers are trying to locate a missing person, it is reasonable for them to begin the search at any potential location where that person might be, and their decisions must be evaluated based on what the officers knew at the time, not based on hindsight. We agree. But Hill does not help the government here.

---

[16] The dissenting opinion's suggestion that Antonio had not looked around the trailer and thus did not really know if his mother was inside is not supported by the record. As the district court found and one of the officers testified, Antonio "could not find his mother" that morning and was concerned about the location of her body. Given Antonio's concern, there is no basis for speculating that he would have failed to look around the trailer, which comprised just a few rooms, to try and find his mother.

To begin, we decided <u>Hill</u> based on qualified immunity grounds and so did not resolve the ultimate merits question of whether the facts of that case satisfied the emergency aid exception. <u>See</u> 884 F.3d at 23 ("[W]here there is reasonable debate about the constitutionality of the officers' actions, there is qualified immunity."). In any event, the facts in <u>Hill</u> are critically different. There, the officers had information that the subject of the search -- Matthew Hill -- could be found at two possible locations, either the Hill residence or Morton Hospital, both of which were listed on the face of the civil warrant the officers were attempting to execute.[17] <u>Id.</u> at 19. Officers were dispatched to the Hill residence; upon arrival, they saw movement inside the home, but nobody responded to their knocking. <u>Id.</u> at 20. Officers then tried to verify their suspicion that Hill was inside, first by walking around the property calling his name, and then by calling dispatch "to see if the dispatchers had any

_____

[17] Pursuant to Massachusetts law, a person may petition a state court for an order of civil commitment of a person who has an alcohol or substance use disorder; in this case, Matthew Hill's sister filed such a petition on behalf of Matthew. <u>Hill</u>, 884 F.3d at 19. If "there are reasonable grounds to believe that such person will not appear" at their hearing, and that "any further delay in the proceedings would present an immediate danger to the physical well-being of the respondent," then the state court may issue a section 35 warrant "for the apprehension and appearance" of the person. Mass. Gen. Laws ch. 123, § 35. Our court in <u>Hill</u> expressly declined to decide whether the "section 35 warrant [wa]s sufficient per se to justify warrantless entry into the home" and treated the warrant only as evidence regarding Hill's location. 884 F.3d at 22 n.2.

additional information about Matthew." Id. at 20. When they could not obtain any additional information about Hill's location one way or the other, they entered the home. Id. at 20-21.

By contrast, here, Antonio and Giambro had both stated just that morning that Arline was not inside the trailer, and the officers could not observe anybody inside the home when they arrived. Further, unlike in Hill, the officers did not attempt to gather more information about Arline's location, and they easily could have done so. A police officer was at the Hospital with Antonio and Giambro during the hour preceding the search, and by all accounts Antonio was reliable, cooperative, and willing to speak to the police. In sum, the officers had no reason to believe Arline was inside the trailer and, to the extent they remained concerned that she nevertheless might be, they easily and quickly could have elicited additional information about her location. Those facts taken together undermine the objective reasonableness of their decision to forcibly enter the trailer without a warrant.

Considering the facts in the record, which indicated that Arline was not in the Hebron trailer and had died at least one day earlier, there was no objectively reasonable basis for the officers to believe that they needed to enter the trailer to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Caniglia, 593 U.S. at 198. Their warrantless entry into the trailer therefore violated

- 31 -

Giambro's Fourth Amendment rights. And because Giambro was convicted solely on the basis of evidence obtained from that entry, his conviction also cannot stand. See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).[18]

### IV. CONCLUSION

For all these reasons, we **reverse** the district court's order denying Giambro's suppression motion, **vacate** Giambro's conviction and sentence, and **remand** to the district court for proceedings consistent with this opinion.

**-Dissenting Opinion Follows-**

---

[18] The government made no argument that the fruits of the search could be saved by the independent source doctrine, which permits the introduction of evidence "obtained independently of any impermissible police conduct." United States v. Rose, 802 F.3d 114, 123 (1st Cir. 2015). Even if it had, such an argument would fail, because "the agents' decision to seek the warrant was prompted by what they had seen during their initial [illegal] entry" -- the numerous firearms located inside the trailer. United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005) (quoting Murray v. United States, 487 U.S. 533, 542 (1988)).

**LYNCH**, **Circuit Judge, dissenting**. With the greatest respect for my colleagues, their holding of a Fourth Amendment violation in this case departs from binding caselaw as to the emergency aid doctrine. I fear that their result will discourage officers from going to the aid of persons in need of such aid. Each of the four officers who entered Giambro's residence had an objectively reasonable belief that Giambro's wife, Arline, may have been in the trailer and in need of immediate medical attention.

The majority view conflicts with Supreme Court caselaw. The Supreme Court's first opinion on the emergency aid exception, Brigham City v. Stuart, 547 U.S. 398, 403 (2006), approvingly cited Chief Justice (then Judge) Burger's opinion in Wayne v. United States, in which he stated:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of "dead bodies," the police may find the "bodies" to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial

> process. Even the apparently dead are often
> saved by swift police response.

318 F.2d 205, 212 (D.C. Cir. 1963) (emphasis added).

The Supreme Court's Stuart decision, and its approval of Wayne, are still good law.[19] The Court followed Stuart in Michigan v. Fisher. 558 U.S. 45, 46 (2009). Importantly, in Fisher, the Supreme Court reversed a lower court which had held that the emergency aid exception did not apply because that lower court erred by "replac[ing] [an] objective inquiry into appearances with its hindsight determination that there was in fact no emergency." Id. at 46-47, 49. The majority makes the same mistake here. The emergency aid exception "must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6(a) (6th ed. 2024). "This means, of course, that it 'is of no moment' that it turns out there was in fact no emergency." Id. (quoting State v.

---

[19] The majority opinion states its view that Wayne is no longer good law because "the report of a death, standing alone, does not support a reasonable belief in an urgent, ongoing emergency," citing United States v. Richardson, 208 F.3d 626, 631 (7th Cir. 2000). A circuit court decision cannot overrule the Supreme Court. And as I discuss in greater detail in Part II, this case involves many relevant facts other than just a report of a dead body. Further, this circuit and others have continued to recognize that officers may rely on the emergency aid doctrine when investigating reports of a potentially dead body.

DeMarco, 88 A.3d 491, 509 (Conn. 2014)). See also State v. Karna, 887 N.W.2d 549 (N.D. 2016) (deputies had a reasonable belief that defendant's father was in immediate need of assistance where dispatcher received a call from defendant's brother that defendant had shot their father and had denied doing so, reasoning the deputies could not ascertain whether the father had been shot before they entered the home).

The Supreme Court again made it clear in Caniglia v. Strom, 593 U.S. 194 (2021) that exigent circumstances justifying warrantless entries include providing emergency aid, though community caretaking concerns do not. As Justice Kavanaugh, concurring, stated, a report of an elderly person who "is uncharacteristically absent" and does not respond to phone calls or knocks on their door remains a paradigmatic example of a circumstance in which officers would be justified in conducting a warrantless search. Id. at 207-08 (Kavanaugh, J. concurring). Both of these circumstances were present here. Chief Justice Roberts, also in concurrence, likewise stressed that "[a] warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously injured or threatened with such injury." Id. at 199-200 (Roberts, C.J., concurring) (quoting Stuart, 547 U.S. at 403). "[R]easonableness . . . must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490

U.S. 386, 396 (1989). "An appeals court should [also] give due weight to a trial court's finding that [an] officer was credible and [their] inference[s were] reasonable." Ornelas v. United States, 517 U.S. 690, 700 (1996). The trial judge who heard the testimony and the evidence and found the officers credible held that the officers' decision to enter was based on each officer's objectively reasonable belief. See United States v. Giambro, No. 2:22-CR-00044, 2023 WL 3123001, at *1 n.2, *4 (D. Me. Apr. 27, 2023). The majority's decision second-guesses both the responding officers and the trial court, marking a substantial and unfortunate curtailment of the emergency aid exception.[20]

Applying those standards to the facts of this case, it is clear that the officers made entirely reasonable decisions based on the information available to them. The officers were directed to the scene after receiving reports from other officers that the son reported his mother had been ill; he could not find her; that his father had once stated that she was dead, but then was evasive; his father's confused mental state and erratic statements caused the son to take him quickly from the home to the hospital; and

---

[20] Because the Government has not advanced any argument that the fruits of their search were admissible as evidence under United States v. Leon, 468 U.S. 897 (1984) and the "good faith" exception to the exclusionary rule, I do not address those issues. But see United States v. Moore-Bush, 36 F.4th 320, 359 n.33 (1st Cir. 2022) (good faith issue not waived when officers' actions comported with the law of the circuit at the time of the search).

they did not know where the mother was. A security officer, hearing the son and the father at the hospital, initially contacted the police and asked for their intervention. Four officers from different law enforcement agencies, with more than thirty years of combined law-enforcement experience, first tried to find Arline outside the trailer to determine whether she was in need of aid. Only then did the officers conduct a warrantless entry into the trailer and then into the locked bedroom. Each officer stated he and the group acted out of concern that there "could have [been] a victim inside that needed medical attention."

The officers had information that was ambiguous at best as to whether there was, in fact, a dead body inside the trailer. They had, from the information they were given, no reason to believe that the father's statement established that his wife was, in fact, beyond any need of help. See Wayne, 318 F.2d at 212 ("Even the apparently dead often are saved by swift police response."). The officers also had information that the son had said Arline, who had been ill, was unaccounted for, and that her last known location was the trailer. When officers choose to search for a missing person in a particular location, "it is not necessary that the officer be in possession of facts that would warrant the belief that what is sought will be found;" rather, "[i]t is only necessary that the facts would warrant the belief that it is appropriate to look to see if there is evidence that

would lead to the missing person." State v. Beede, 406 A.2d 125, 130 (N.H. 1979).

The officers were well-trained in Fourth Amendment law and reasonably decided these steps were needed. That two members of this Court second guess the decision by these four law enforcement officers, a decision upheld by an experienced district court judge, does not make the officers' judgment calls on the scene objectively unreasonable.

**I.**

The majority errs when it looks only to the facts explicitly stated by the district court. In Fourth Amendment suppression cases, our rule is that the appellate court must consider "facts and inferences . . . taken from the bench decision . . . as well as testimony at [the suppression] hearing."[21] United States v. Murdock, 669 F.3d 665, 667 (1st Cir. 2012); see also United States v. Arnott, 758 F.3d 40, 44 (1st Cir. 2014) (affirming

---

[21] Indeed, the rule applies more broadly. In reviewing denials of qualified immunity, as the Supreme Court established in Johnson v. Jones, 515 U.S. 304 (1995), when the district court fails to articulate a relevant finding of fact, a court of appeals reviews the record "to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Id. at 319; see also Begin v. Drouin, 908 F.3d 829, 832 (1st Cir. 2018) (observing that, on interlocutory review of the denial of a motion for summary judgment on qualified immunity grounds, when the district court fails to articulate a relevant finding of fact, "we review the record 'to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed'" (quoting Johnson, 515 U.S. at 319)).

district court's suppression hearing decision based not exclusively on the findings of fact but on other facts in the record).

The evidence of record establishes that the officers had an objectively reasonable basis for thinking they needed to search for Arline. That alone should lead to an affirmance in this case.

Even beyond that, at least two of the officers also had reason to believe that Arline, who had been the subject of a welfare check by one of them the prior year, may well have been the victim of domestic violence. That the Government's appellate counsel at oral argument before us may have erroneously said the welfare check was not in the record at the suppression hearing does not support the majority's position. When the record contradicts a government concession, we are not bound by it. United States v. Borrero-Acevedo, 533 F.3d 11, 15 n.3 (1st Cir. 2008) ("This court is not bound by a party's concessions.").

I recite the facts of record. Each of the responding officers had been given somewhat different information when they made the decision to enter Giambro's home. The two most experienced law enforcement officers on the scene, State Police Sgt. Hanson and MDEA Agent Lt. Libby, testified at Giambro's suppression hearing. Deputies Tiner and Pelton were not called to testify, but other evidence establishes what they knew before entering the trailer. Nothing in the record contradicts the

officers' testimony as to their concern for Arline's wellbeing and their motivation for conducting a warrantless search.

The police intervention which ultimately led to the search at issue was initially sought by a security guard at Stephens Memorial Hospital in Norway Maine, who was present when Giambro and his son Antonio arrived and who apparently spoke with Antonio about the situation. The security officer communicated to police dispatch for Oxford County, which included the town of Norway, that Antonio "brought in his father to the hospital because he is confused but he said that his mother is at the house deceased . . . he is here with the father and they don't know what happened to the mother." Because of the security guard's call, Norway Police Department Corporal Robert Federico was dispatched to Stephens Memorial Hospital. Upon arriving at the hospital, Cpl. Federico spoke with Antonio in the lobby of the ER.

During his conversation with Antonio, Norway Police Cpl. Federico learned that Giambro had been brought to Stephens Memorial Hospital from his trailer in the nearby Oxford County town of Hebron. Norway Police Cpl. Federico then had several conversations with Oxford County dispatch or the Oxford County Sheriff's Office, the county with jurisdiction over the trailer. Although Cpl. Federico initially asked that an officer from Hebron come to the hospital, that changed when he contacted Oxford County Deputy Tiner by phone.

During that conversation, Norway Cpl. Federico told Oxford County Deputy Tiner that Antonio had gone to plow his father's driveway the night before "and when he went to knock on the door he didn't get any answer." That "concerned [Antonio] enough that he attempted to call several times and didn't get any answer to the phone calls until the following morning." Deputy Tiner was informed that, when Antonio did speak with his father, "his father sounded off," which "was concerning for him enough that he drove [to his parents' home] to meet with him in person." Deputy Tiner was told that Giambro had told Antonio "that the mother had died while [Antonio] was on vacation" and that Giambro would not elaborate other than to say that "she just didn't wake up." And Antonio had stated he felt his father "was being evasive toward him." Deputy Tiner was also aware of notes in Giambro's electronic file that Giambro had previously "shot a subject." Cpl. Federico testified that "at that point really nobody knew exactly what was going on, and there w[ere] some concerns for the wife, if she was dead or not or maybe unconscious and just nobody knew." Even Cpl. Federico, on whom the majority so strongly relies, reinforces that the officers shared concerns that Arline might not be dead but unconscious and, so, in need.

The most experienced officer who made the warrantless entry was Sgt. Daniel Hanson with the Maine State Police, who had more than 21 years of experience in the State Police and prior

- 41 -

experience with the Paris Maine Police Department. Sgt. Hanson had undergone extensive training at police academies and completed on-going in-service training. He had been called by Lt. Tilsley, who had in turn been called by the Oxford County Sheriff's Department asking for assistance at the Giambro property, located at 692 Paris Road. The information he received from Lt. Tilsley prior to arriving at the scene is described as follows:

> [Antonio had] gone to check on his parents, had found his father at the residence, found his father ill, could not find his mother, and brought his father to the hospital. [Antonio's] father had relayed to him that his mother was deceased but did not give any indication of where she was and didn't advise him of where she was.

Sgt. Hanson testified repeatedly and without challenge that he and Deputies Tiner and Pelton, and the newly arrived MDEA Agent Lt. Libby, "were trying to find Arline" because "she was unaccounted for" so they could "verify[] her welfare." When asked what that meant, he answered: "Well, the information we had received was she was supposedly deceased, but we don't know that to be fact. We have to try and verify that she's okay and the possibility that she may need medical assistance." When asked next "what concern[s], if any, do you have in terms of identifying the need for medical treatment . . . at that point in time," he replied: "There's no response from the residence. If she had been in there and she was okay, we would most likely expect that there

would be some kind of a response, a voice, something, anything, and there was an absence of that."

State Police Sgt. Hanson then was asked "[w]hy was the decision made not to get a warrant but to enter the residence?" He answered: "There was potential that we could have a victim inside that needed medical attention."

After cross examination as to why he had not waited and instead relayed a request to Cpl. Federico to ask Giambro for permission to enter, he explained:

> Because, I mean, this is a concerning situation. We don't take entering into a residence lightly, and you have to know what -- you know, where those lines are. And that was evaluated in this situation, just like it is in any other, that we have to exhaust those means to try and verify. That's what -- we were checking into rescue calls, looking to see if there had been anything further, what do we have for information. And we got to that point and we're like, you know, we really don't have any other option but to go in and verify if she's in there and if she -- what her status is.[22]

Sgt. Hanson's report following the search corroborates the testimony he provided at the motion hearing. Sgt. Hanson's report memorialized that he and the officers "knew Arline Giambro was unaccounted for and Antonio was concerned for her welfare as she

---

[22] Sgt. Hanson was an officer with many experiences serving warrants. In his experience, obtaining a warrant takes "a couple hours" and a couple of hours' wait, in light of the circumstances, was just too long.

should have been at the residence and his father told him she was deceased." At "1157hrs Agent Libby forced the front door and we entered to check the welfare of Arline." The officers "exited the residence at 1205 hrs after not locating Arline inside."

MDEA Special Agent Lt. Libby also testified. When he arrived, Deputies Tiner and Pelton and Maine State Police Sgt. Hanson were in the driveway outside Giambro's trailer.[23] Lt. Libby began working in law enforcement in 1997, including roughly 15 years with the MDEA. He attended the police academy and the MDEA academy, and completed supplemental training annually.

Like Sgt. Hanson, Lt. Libby testified repeatedly and without contradiction that he and the other officers were there to "confirm whether [Arline] needed medical attention or not." Before entering the trailer, Lt. Libby and Sgt. Hanson walked "around the back side of the trailer to see if [they] could see tracks in the snow." The two were "trying to see if there [were] tracks leading off in the snow, a place where we could go check, look for somebody, look for Arline" to "confirm whether she needed medical attention or not." Lt. Libby and Sgt. Hanson saw no tracks behind the trailer. Lt. Libby then looked in the windows of the trailer, but

_____

[23]  Lt. Libby was informed by Deputy Tiner that Antonio had been at the house earlier that morning and that he and Giambro went to the hospital, where Giambro said that his wife "had gone to greener pastures or something along [those] lines" but was "being cryptic about it."

"could not see in any windows" because "[t]here was plastic over the windows and/or there was like curtains or something on the inside."  Lt. Libby next "went down" to "a garage to the left of the house" and "looked around there, too" to "try to see if [he] could find Arline" including by looking in the windows of the garage, but he "didn't see anybody."

Only then did Lt. Libby return to the trailer, where he "banged on the door very loud, very hard" while "yelling [']sheriff's office.[']"  When asked why he was "knocking on [the] door and announcing [him]self," Lt. Libby testified that he "was under the impression that Arline might need medical attention" and he "needed to confirm whether she did or not."

Lt. Libby testified that Sgt. Hanson then made the decision to enter the trailer "[t]o go in and confirm whether Arline was deceased or not or needing medical attention."  When asked "why a warrant wouldn't be appropriate or why you didn't seek a warrant at that point," Lt. Libby testified that it was because of "exigent circumstances to see if somebody needed medical attention or not" because "if she was injured or hurt and she needed help, [the officers] needed to get help to her as fast as [they] could."  Lt. Libby testified that "what [he] had learned from [Deputy] Tiner was that Antonio had brought his father to the hospital and made some vague statements, something to like the effect of like mom has gone on to greener pastures . . . . And we

needed to confirm whether Arline did or did not need medical attention." Lt. Libby "didn't want to base" any conclusion as to Arline's status on "[Giambro's] opinion of whether somebody was dead or not . . . [Lt. Libby] wanted to confirm that with [his] own eyes."

Lt. Libby "shouldered the door open" at 11:57 A.M., and testified that at this time he "knew nothing about firearms" inside the residence. Once inside, Lt. Libby found "a secured door off the kitchen" and "stayed there at that door until the rest of the trailer was cleared." After the trailer was cleared, Sgt. Hanson "tried opening . . . that door" at which point Lt. Libby went toward the back of the trailer "because [he] thought [he] heard one of the deputies still clearing the room at the far end of the trailer." While walking through the trailer, Lt. Libby passed a middle bedroom in which he "observed a pillow sitting on the bed with what appeared to be dried brown stains." Lt. Libby testified that he "ma[de] a mental note of what [he] saw" because he was "there because Arline might be possibly dead" and he thought the stains "might be blood."

Lt. Libby left the residence at 12:05 P.M., "spoke for a few minutes" with the other officers in the driveway, then "departed and headed to the sheriff's office" where he did his report. After he had left, he received a call from someone on the Giambro property notifying him that they had located Arline's body.

The undisputed facts show the responding officers first conducted a search for Arline outside the trailer and did not find her before they decided they had to search the trailer. The officers "bang[ed] on the [trailer] door" repeatedly, "hollered . . . banged on walls, windows," and got no response. The officers "walk[ed] around the back side of the trailer to see if [they] could see tracks in the snow." The officers observed "[n]othing behind the trailer" or around the nearby garage. The officers attempted to look in the trailer's windows, but "[t]here was plastic over the windows and/or there was like curtains or something on the inside" which meant they could not see inside.[24] "The only recent activity was right there by the house, and none of it in the snow."

Before the officers entered the trailer, they also "checked with dispatch to see if there had been any rescue calls" and "verified that there was no recent medical calls or requests

_____

[24] The majority concludes the officers were unreasonable because they did not first break into the garage and because they failed to find her body in the woods behind the garage. None of this renders the officers' actions objectively unreasonable. The footprints that led the officers to Arline's body were obscured behind sizeable snowbanks and had been covered by "recent storms." The officers discovered those prints while searching for something they could use to dig out snow blocking the garage's side door. As to the garage itself, the officers almost certainly needed a warrant or an applicable exception to enter the garage just the same as to enter the trailer. See United States v. Dunn, 480 U.S. 294, 300-01 (1987) (laying out test for determining whether an outbuilding is within a home's curtilage and therefore "should be treated as the home itself").

for assistance at the residence." Officers also knew Giambro had not called either emergency services or a funeral home following Arline's purported death, as would normally be the case. The majority points to these facts as evidence that Antonio was not "worried that his mother was still alive and in need of aid." The majority then posits that this should have told the officers there was not an "urgent, ongoing emergency." But these facts led the officers to the even more reasonable interpretation that if Arline were truly dead, any husband would have called a funeral home (or emergency services). And the lack of any such call only added to the uncertainty as to whether Arline was in need of assistance. See United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) ("When reviewing a challenge to the district court's denial of a motion to suppress, '[w]e view the facts in the light most favorable to the district court's ruling.'" (quoting United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008) (alteration in original)).

The officers were not objectively unreasonable in concluding that the information they had that Giambro had said Arline was dead did not establish that she was indisputably dead. Further, the officers had no information that Antonio had searched the entire trailer for Arline before taking his father to the hospital. And the record does not establish that Antonio did, in fact, conduct such a search. On the contrary, Cpl. Federico, who

spoke with Antonio at the hospital and relayed those initial interactions to Deputy Tiner, did not recall "ask[ing] Tony any questions about whether he'd looked around the house." The trailer was large and comprised of several rooms, including a bathroom and multiple bedrooms separated by a hallway. Indeed, when the officers did enter, they found "a room to the north side that was locked" and, thinking Arline might be there, entered the room looking for her.

Beyond that, there is no evidence that the four responding officers received any further information from officers at the hospital in the approximately "six or seven minutes" that elapsed between their arrival on the scene and their decision to enter the residence.

## II.

"[L]aw enforcement officers may enter private property without a warrant . . . to 'render emergency assistance to an injured occupant." Caniglia, 593 U.S. at 198 (quoting Kentucky v. King, 563 U.S. 452, 460 (2011)). This emergency aid doctrine is a subcategory of the exigent circumstances exception to the warrant requirement. Missouri v. McNeely, 569 U.S. 141, 149 (2013) ("A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search, including law enforcement's need to provide emergency assistance to an occupant of a home . . . .") Under the emergency aid doctrine, a warrantless entry is

- 49 -

permissible when "there [is] 'an objectively reasonable basis for believing' that medical assistance [is] needed."[25] Fisher, 558 U.S. at 49 (quoting Stuart, 547 U.S. at 406).

Entry for the purpose of rendering aid is reasonable "to seek an occupant reliably reported as missing." 3 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 6.6(a) (6th ed. 2024). See also Hunsberger v. Wood, 570 F.3d 546, 555 (4th Cir. 2009) (entry lawful when there was evidence a minor was in the home, it was the middle of the night, her stepfather said she was not supposed to be there, and the fact that she was not answering her cell phone suggested she might be hurt or otherwise in need of aid); People v. Rogers, 209 P.3d 977, 995-96 (Cal. 2009) (search of 3 storage rooms under defendant's apartment lawful given defendant's lack of concern over the whereabouts of his child's

---

[25] The majority asserts that any consideration by the officers of the delay it would take to apply for and obtain a search warrant is completely irrelevant to the emergency aid doctrine. Not so. Exigent circumstances and emergency aid are at least overlapping doctrines. As the Supreme Court said in Stuart, the need to render emergency aid is "[o]ne exigency obviating the requirement of a warrant." 547 U.S. at 403. But "caselaw has not been entirely clear regarding the distinctions." William E. Ringel, Searches and Seizures, Arrests and Confessions § 10:8.10 (2d ed. 2024). Justice Alito, concurring in Caniglia, stated "[w]e have held that the police may enter a home without a warrant when there are 'exigent circumstances.' But circumstances are exigent only where there is not enough time to get a warrant, and warrants are not typically granted for the purpose of checking on a person's medical condition." 593 U.S. at 203 (Alito, J., concurring) (internal citations omitted). I see no basis in Justice Alito's concurrence for the majority's characterization of it.

mother, his threat to lock her in the basement, and his physical reaction when police mentioned that threat); State v. Horn, 91 P.3d 517, 520-26 (Kan. 2004) (entry lawful when police possessed information that 90-year-old woman had broken her routine and had not been seen in several days and her son, against whom she once had a protection order but with whom she now lived, had refused to allow a neighbor to see his grandmother), overruled on other grounds by State v. Neighbors, 328 P.3d 1081 (Kan. 2014).

"[T]he Fourth Amendment's reasonableness requirement gives officers facing exigent circumstances ample 'breathing space to do the best they could with the information they had.'" United States v. Cooks, 920 F.3d 735, 743 (11th Cir. 2019) (quoting Montanez v. Carvajal, 8889 F..3d 1202, 1210 (11th Cir. 2018)). "[I]n reviewing a challenge to a warrantless search under the emergency aid exception to the warrant requirement, the court examines the conduct of the officers in light of what was reasonable under the fast-breaking and potentially life-threatening circumstances that were faced at the time, and will avoid viewing the events through the distorted prism of hindsight." 79 C.J.S. Searches § 79 (2024). "[I]t's not our role to armchair quarterback the officers' decision." Cooks, 920 F.3d at 743. Prior decisions in this Circuit and elsewhere have recognized that "breathing space," and the majority departs from clear precedent.

To give one example, this court held that officers had an objectively reasonable basis for entering plaintiff Matthew Hill's home to seize him after a warrant was issued for his civil commitment following a report from his sister that Hill had been "behind his building . . . on the verge of an overdose" and "was going to kill himself if he didn't get help." Hill v. Walsh, 884 F.3d 16, 19 (1st Cir. 2018). When officers arrived at Hill's parents' house, one "thought he had seen a shadow of a person inside," and entered the residence only to find that Hill was not at home. Id. at 20. We rejected Hill's argument that since "the face of the . . . warrant clearly indicated that Matthew was 'CURRENTLY AT MORTON HOSPITAL'" the officers lacked an objectively reasonable basis for their belief that Hill needed aid because "Matthew's history of overdosing and resisting the police, the subject line of the warrant [which listed Hill's address], and the appearance of a person inside the home" could lead a reasonable officer to "reasonably conclude[] that her entry was lawful." Id. at 23. And in United States v. Beaudoin, we observed that "society expects police to investigate reports of dead bodies, and to do so promptly" because "the reportedly 'dead' body might yet be alive and prompt action could save the person." 362 F.3d 60, 70 (1st Cir. 2004), vacated on other grounds sub nom. Champagne v. United States, 543 U.S. 1102 (2005).

The majority opinion further departs from this Court's own precedent by cherry-picking from the record. This Court's precedent establishes that "[t]he requisite inquiry must be undertaken in light of the totality of the circumstances confronting the [official], including, in many cases, a need for an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences." United States v. Infante, 701 F.3d 386, 392 (1st Cir. 2012) (alteration in original) (emphasis added) (quoting United States v. Martins, 413 F.3d 139, 146 (1st Cir. 2005) abrogated on other grounds by Hill, 884 F.3d at 19. For all of these reasons, the majority is simply wrong.

But the record shows even more undercutting the majority's position. Before entering, Deputy Tiner knew, and shared with at least Sgt. Hanson, that "about a year before" he had "done a welfare check on [Arline]" during which "he could not get actual contact with her, that she was only able to talk to him through a window and that . . . he was not allowed to have any [] face-to-face contact with her." Giambro's electronic file includes information about that welfare check and lists Giambro as "[i]nvolved." These crucial pieces of evidence from the suppression hearing were not incorporated into the majority's analysis and demonstrate that at least two of the entering officers had reason to think that Arline might well be a victim of domestic

violence.[26]  Deputy Tiner knew that: (1) a welfare check on Arline at the Giambro residence had been requested for an incident involving Giambro; (2) when Deputy Tiner went to the property to conduct that check, Arline was prevented from coming to the door and from allowing Deputy Tiner to enter; (3) Giambro's electronic file contained a note from 2010 documenting that he had previously shot someone; (4) Arline was unaccounted for; and (5) Giambro was now behaving evasively toward his son.  Deputy Tiner related at least some of this information to at least one other officer. These facts provided an objectively reasonable basis for concluding that Arline may have been the victim of domestic violence.[27]

---

[26]  Deputy Tiner's prior experience at the Giambro residence also helps to explain why he "did not go to the Hospital as Cpl. Federico had requested through Dispatch" and instead "proceeded directly to the Giambro property."

[27]  Courts have repeatedly recognized that "[d]omestic violence situations require police to make particularly delicate and difficult judgments quickly."  Commonwealth v. Gordon, 29 N.E.3d 856, 864 (Mass. App. Ct. 2015).  "Domestic violence presents unique challenges to law enforcement" in that those situations "can be volatile and quickly escalate into significant injury" and "often, if not usually, occur[] within the privacy of a home." State v. Schultz, 248 P.3d 484, 487 (Wash. 2011) (en banc). Evidence that someone "may have been the victim of domestic violence is a factor that police may consider in determining whether an emergency exists involving a particular individual and whether a warrantless entry is reasonably necessary to render assistance."  Gordon, 29 N.E.3d at 865.  Because of "the combustible nature of domestic disputes," courts "have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the

The events that occurred during Deputy Tiner's prior welfare check are classic signs of domestic abuse. See Giles v. California, 554 U.S. 252, 380 (2008) (Souter, J., concurring) (noting that "in the classic abusive relationship" the abuser attempts to "isolate the victim from outside help, including the aid of law enforcement"); United States v. Nwoye, 824 F.3d 1129, 1138 (D.C. Cir. 2016) (observing that "batterers often isolate their victims"); State v. Rodriguez, 636 N.W.2d 234, 345 (Iowa, 2001) ("[I]t is very common for the abuse to . . . isolate the victim from others so they do not know what is going on. This isolation . . . commonly extends to controlling the victim's . . . access to medical care and treatment."). An officer would reasonably draw an inference from the circumstances of the welfare check on Arline that she was a victim of domestic violence. It is typical for domestic violence victims, especially when they are in the presence of their abusers, to be too afraid to speak to officers. It is obvious that Deputy Tiner thought his prior welfare check was relevant to the events that were unfolding because he took the time to tell Sgt. Hanson about it. That the written record of the welfare check does not, in so many words,

dispute was in danger." Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998); see also Cotten v. Miller, 74 F.4th 932, 934-35 (8th Cir. 2023) ("[I]t was reasonable for the officers to believe that a woman . . . in the . . . apartment was a victim of domestic violence, and was injured or threatened with future injury.").

- 55 -

state a conclusion that this was an incident of domestic violence does not change this fact.[28]

The majority attempts to justify its conclusion by saying the officers testified consistently that they had no basis to believe a crime had been committed before they entered the residence. That misses the point -- the officers' testimony was that they acted under the emergency aid exception.[29]

The majority also omits important facts when it criticizes Deputy Tiner's decision to go directly to the residence rather than first going to Stephens Memorial Hospital to talk directly with Giambro. The record evidence shows that, when he first called dispatch, Cpl. Federico said they "may wish to have a deputy come [to the hospital] to talk to [Giambro]," (emphasis added) but he also testified that he "explained to [dispatch] that whatever it was that was going on appeared that it was at the parents' residence." Cpl. Federico then placed a second call to dispatch, informing them that they "may want to let the deputy

---

[28]    We know from further evidence at sentencing, which we do not consider on a motion to dismiss, that Arline was, in fact, previously a victim of domestic violence at Giambro's hands. This evidence was not known to the officers when they entered the residence, but it clearly reinforces the reasonableness of Deputy Tiner's concerns.

[29]    The majority also overstates the record. Sgt. Hanson testified only that he "thought [he] did not have probable cause to expect any criminal activity" and Lt. Libby said "nobody told [him] it was a crime scene."

know that the subject has multiple comments in his [names] file, they might want to review that." Cpl. Federico then asked dispatch to have Deputy Tiner call him, which Deputy Tiner did. Cpl. Federico testified that, during that phone call, the two "did talk a little bit about the concerns as to whether . . . [Arline] really was dead or not, if she could be there needing assistance" and "the information that [Giambro] had in his names file," and that there was also "talk of him trying to have somebody, whether it be [Deputy Tiner] or I don't know who, but go to the residence." Contrary to the majority's characterization, both Deputy Tiner and Cpl. Federico had concerns as to whether Arline was in need of aid, and Deputy Tiner discussed with Cpl. Federico the need for a deputy to go to the residence. It is also clear that Cpl. Federico, like Deputy Tiner, thought that the content of the names file was important context for the situation and communicated that to Deputy Tiner.

Further, there is no evidence that the other three officers were ever aware that Cpl. Federico ever first suggested a deputy come to the hospital. Lt. Libby testified that he decided to go to the house on his own when he learned officers were there. Sgt. Hanson testified that he was contacted by Lt. Tilsley and instructed to go to the residence.

The majority also departs from our circuit precedent requiring deference to the trial judge's credibility findings that

- 57 -

the officers' stated reasons were their reasons and that these reasons were objectively reasonable.  Where the trial court took testimony from the officers who entered the residence, and "[t]he suppression hearing transcript discloses abundant support for the district court finding" such "[t]rial court credibility determinations are prime candidates for appellate deference." United States v. Nunez, 19 F.3d 719, 724 (1st Cir. 1994); see also United States v. John, 59 F.4th 44, 48 (1st Cir. 2023) (when reviewing a district court's denial of a motion to suppress, appellate courts  "give appropriate weight to the inferences drawn by the district court and the on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the witnesses and events." (quoting United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014))).

The majority's holding also creates a circuit split.  As the Seventh Circuit has noted, the need for emergency aid justified a warrantless entry where the entering officer knew that a neighbor and doctor were "unable to get in touch" with a person, leading the neighbor to report to police that Gaetjens may have been "experiencing a medical emergency."  Gaetjens v. City of Loves Park, 4 F.4th 487, 493 (7th Cir. 2021).  The warrantless entry was justified when police "could not see anyone inside" Gaetjens's house and were told by the concerned neighbor that "perhaps Gaetjens was at her other home."  Id. at 490.  The Seventh Circuit

stressed that "[p]olice knew nobody had heard from Gaetjens, her neighbor was concerned about a medical emergency, and the mail and garbage at her house were piling up. It was therefore reasonable for police to believe she was inside, despite any evidence suggesting otherwise." United States v. Maxwell, 85 F.4th 1243, 1247 (7th Cir. 2023) (en banc) (discussing Gaetjens, 4 F.4th 487).

Like the officers in Gaetjens, the officers who entered Giambro's trailer had reliable information that Antonio had been unable to get in touch with his mother, did not know where she was, and that she might or might not be alive, and for the reasons described earlier she might well be in need of aid. The officers had no reason to believe that the son had exhaustively searched the large trailer, including its separate bedrooms and the locked room, nor could they eliminate the possibility that if Arline had been outside the trailer that she returned to the trailer after Antonio left. The officers had no reason to believe Giambro, described as being "evasive," was being truthful, and even if he were, no reason to believe that his assessment of Arline's condition was accurate. Indeed, his statement she "just did not wake up" was far from a circumstance in which "the report indicated that the body had been languishing in the house for several days" or "where other evidence might have made it clear that the victim

was indeed dead, and not hovering on the verge of death."[30] Richardson, 208 F.3d at 631. In light of this uncertainty, Lt. Libby testified that he did not want to assume Arline was dead based solely on Giambro's "opinion of whether somebody was dead" he "wanted to confirm that with [his] own eyes." See id. (crediting officers' testimony that "in their experience, laypersons without medical knowledge are not in a position to determine whether a person is dead or alive. Someone who appeared to be dead might revive with immediate medical treatment," therefore the officers "assume that anyone reported dead might be alive unless the report comes from qualified personnel").

In Sutterfield v. City of Milwaukee, the Seventh Circuit held that officers "had objectively reasonable grounds" for entering Krysta Sutterfield's home after receiving a call from Sutterfield's physician "express[ing] concern for Sutterfield's well-being" because of Sutterfield's suicidal thoughts and "declar[ing] a need for intervention on [Sutterfield's] behalf." 751 F.3d 542, 566 (7th Cir. 2014). This was so notwithstanding the fact that nine hours had passed since the initial telephone

---

[30] The majority attempts to rely on Richardson but ignores the fact that the Richardson court distinguished between cases where there were uncertain reports of a dead body and cases where it was obvious to a lay person that the victim is dead and acknowledged that the officers' "modus operandi that is designed to save potential fatalities, where it is objectively reasonable to think that this is possible, is permissible." 208 F.3d at 631.

call, id. at 562, statements from Sutterfield to the police that "she was fine and that she did not want anyone to enter her residence," id. at 547, and a follow-up phone call from Sutterfield's doctor "advis[ing] [police] that Sutterfield had called her some minutes earlier stating she was not in need of assistance and that the doctor should 'call off' the police search for her," id. at 545. The Seventh Circuit observed that "it [was] not at all clear . . . that the mere passage of time without apparent incident was sufficient to alleviate any concern" and that "it was objectively reasonable for the officers to believe that their intervention was required in order to prevent Sutterfield from harming herself, notwithstanding her own protestations to the contrary." Id. at 566; see also Nowell v. State, 663 S.W.3d 369, 371 (Ark. 2023) (police had objectively reasonable basis to enter trailer during welfare check conducted twenty minutes after mother of defendant's girlfriend called police to report she had received a suicide note from girlfriend dated three days earlier). The court stressed that they were "not in any position . . . to second guess the police." Id.

The Ninth Circuit held officers had an objectively reasonable basis for believing someone might be in need of immediate assistance when they received a 911 call about someone "screaming at the top of his lungs and threatening somebody" inside a house. United States v. Guillen, 755 Fed. Appx. 643, 645 (9th

Cir. 2018) (unpublished opinion).  Upon arriving at the house, police encountered Guillen, who "appeared upset" and "told the officers he had been 'blowing off steam.'"  Id. at 646.  When Guillen "refused to say what those issues were, the officers asked whether anybody was inside the house.  Guillen responded affirmatively, saying his roommate was inside."  Id.  The Ninth Circuit held that "the substance of the 911 call, the nature of the encounter . . . outside the house, and its corroboration of the 911 call" gave the officers "an objectively reasonable basis to conclude somebody inside required their immediate assistance," notwithstanding officers' lack of evidence that the roommate was the individual being threatened and Guillen's assurance that he was just "blowing off steam."  See id.

The Eleventh Circuit held that exigent circumstances justified entry into Eric Harrison's hotel room because the officers "reasonably believed [Harrison's] mental state made him a danger to himself" when the officers knew that Harrison: (1) "told a family member he spent the day with their long-dead grandmother"; (2) "told guests and hotel staff that he owned the hotel"; (3) "was regularly ordering room service and timing how long it took to arrive"; (4) "was speaking in a garbled manner and laughing maniacally as the officers approached his room"; (5) "did not seem to understand that [the responding officers] were police officers instead of hotel employees"; and (6) where "a guest in a

neighboring room reported hearing screaming and glass breaking" in the room "throughout the day." Harrison v. Davidson Hotel Co., LLC, 806 Fed. Appx. 684, 688 (11th Cir. 2020) (unpublished opinion). The risk posed to Harrison by his mental health issues, which largely involved confusion rather than overtly dangerous behavior, was considerably more speculative than the risk that Arline Giambro was gravely ill or injured.

The Fourth Circuit held that officers had an objectively reasonable belief that Ralph Cloaninger posed a danger to himself after officers received a 911 call from a VA doctor requesting "police assistance for a suicide threat." Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 332 (4th Cir. 2009). Police "knew Cloaninger had previously made suicide threats and believed Cloaninger had firearms in the house." Id. "[T]he initial VA call, coupled with knowledge of Cloaninger's prior suicide threats and the belief that he possessed firearms, established to an objectively reasonable police officer that Cloaninger was a danger to himself." Id. at 334. The officers who entered Giambro's residence, like the officers who entered Cloaninger's, had reports from a reliable source that someone might be in danger, and had knowledge of past events that tended to corroborate the report.

The majority attempts to distinguish these cases by pointing to the fact that, in many, a "relative or neighbor asked

officers for assistance, expressing concern about a person who was unaccounted for and whose health status was either unknown or unstable." This ignores the fact that the Security Guard at Stephens Memorial Hospital who asked police for assistance and reported to police that Antonio and Giambro "d[id]n't know what happened to the mother." Such a report is not merely an "[a]nonymous tip[], without more," Beaudoin, 362 F.3d at 70, it is a report from a reliable source, a hospital security guard, with expertise in both medical emergencies and interfacing with law-enforcement. That the Security Guard contacted law enforcement supports the officers' actions.

The majority opinion likewise creates a circuit split as to the deference that should be afforded to the trial court's credibility determination. Any such "credibility determination is within the trial court's purview, and we 'defer to the [trial court's] determinations unless [its] understanding of the facts appears to be unbelievable.'" United States v. Evans, 958 F.3d 1102, 1107 (11th Cir. 2020) (quoting United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)) (affirming denial of motion to suppress); see also United States v. Hatfield, 333 F.3d 1189, 1193 (10th Cir. 2003) (noting that, in the context of a Fourth Amendment challenge, "[i]t is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence

presented, and we must give such determinations due deference" (quoting <u>United States</u> v. <u>Le</u>, 173 F.3d 1258, 1264 (10th Cir. 1999)).

**III.**

Because the officers' entrance was constitutional, it is clear, based on uncontradicted evidence from the suppression hearing, that many of Giambro's guns were then in plain view of the officers.  <u>See</u> <u>Spencer</u> v. <u>Roche</u>, 659 F.3d 142, 149 (1st Cir. 2011) ("[A] police officer's observation of an item in plain view does not constitute a search so long as the officer makes his observation from a lawful vantage point.").  I respectfully dissent.