August 19, 2025

**Supreme Court**

No. 2024-38-C.A.
(P1/22-1873AG)

(Dissent begins on Page 24)

State                    :

   v.                    :

Nathan Cooper.           :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|            |   |
|------------|---|
| State      | : |
| v.         | : |
| Nathan Cooper. | : |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Nathan Cooper, appeals from a judgment of conviction and commitment following a jury trial held in the Providence County Superior Court.  The defendant was charged with nine counts relating to a murder that occurred in March of 2022.  On appeal, the defendant contended that the trial justice erred in denying his motion to suppress tangible evidence seized as the result of a warrantless search of his apartment.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

- 1 -

# I

## Facts and Travel

This case stems from a fatal shooting that occurred in an apartment complex located at 43 Parkis Avenue in Providence in March of 2022. That shooting resulted in the tragic death of a woman named Sherbert Maddox.

This case began when officers of the Providence Police Department arrived at 43 Parkis Avenue to make inquiries about certain individuals who they had reason to believe might be in need of assistance. Those inquiries eventually led to the warrantless entry of defendant's apartment. The entry into defendant's apartment resulted in the seizure of certain evidence, including two firearms and the dead body of Sherbert Maddox.

On May 27, 2022, a grand jury indicted defendant on nine counts: one count of murder (Count One); one count of discharging a firearm while in the commission of a violent crime (Count Two); two counts of unlawfully possessing a firearm (Count Three and Count Four); one count of unlawfully possessing a stolen firearm (Count Five); two counts of assault with a dangerous weapon (Count Six and Count Seven); one count of failing to report a suspicious or unusual death (Count Eight); and one count of false imprisonment (Count Nine).

The defendant filed a motion to suppress certain evidence on March 27, 2023; a hearing on that motion took place on May 2, 2023, and on the next day the trial

justice denied the motion. On May 9, 2023, a jury trial commenced. In the course of trial, Counts Five through Nine were dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. The jury ultimately found defendant guilty of second-degree murder (Count One); and it also found him guilty of the counts which had not been dismissed—*viz.*, Counts Two, Three, and Four. The defendant subsequently filed a motion for a new trial, which the trial justice denied in a decision that was entered on July 21, 2023.

On September 26, 2023, defendant was sentenced as follows: a life sentence on the second-degree murder count; a consecutive life sentence on the count of discharging a firearm while in the commission of a violent crime; and two concurrent ten-year sentences on the two counts pertaining to the unlawful possession of a firearm.

The pertinent facts of this case are gleaned primarily from the hearing on defendant's motion to suppress. We relate below the salient aspects of what transpired at that hearing.

**A**

**The Hearing on Defendant's Motion to Suppress**

As previously noted, on March 27, 2023, defendant filed a motion to suppress. The basis of defendant's motion was his contention that the "warrantless entry into his home was in violation of his Fourth and Fourteenth Amendment rights under the

United States Constitution; Article I § 6 of the Rhode Island Constitution; Rhode Island General Laws § 9-19-25; and Rhode Island Superior Court Rule of Criminal Procedure 41(f)."[1]  A hearing on the motion to suppress took place on May 2, 2023. At that hearing, various witnesses were called to testify; and we now proceed to summarize the pertinent portions of their testimony.

### 1. The Testimony of Patrolman John Palmer

Patrolman John Palmer of the Providence Police Department testified that he responded to the 43 Parkis Avenue area "in the early morning hours of March 22, 2022." Officer Palmer recalled that one of the other officers patrolling the area had been "flagged down by a couple of individuals" and that he was then called to investigate. Officer Palmer stated that, when he arrived outside the 43 Parkis Avenue apartment complex, he spoke with one Marvin Maddox.

Officer Palmer testified that Mr. Maddox was concerned about the well-being of his niece, Sherbert Maddox, because "he heard that she had been killed at [the] apartment and she was still there in a refrigerator." Officer Palmer recalled that Mr. Maddox stated that he had received this information from an individual who had

---

[1]  As a practical matter, it is not necessary for us to discuss in this opinion either G.L. 1956 § 9-19-25 or Rule 41(f) of the Superior Court Rules of Criminal Procedure. Those two provisions have no substantive bearing on our analysis of the constitutional issues that we address in this opinion.

As for defendant's reference to article 1, section 6, of the Rhode Island Constitution, *see, e.g.*, *State v. Andujar*, 899 A.2d 1209 (R.I. 2006).

called him earlier in the day.[2]   It was also Officer Palmer's testimony that Mr. Maddox told him that he had not personally heard from his niece "in the past three or four days" and that this was "odd" because he typically spoke with her every day. Officer Palmer further stated that Mr. Maddox believed that his niece's "boyfriend at the time" was responsible for the "potential homicide of his niece."   Officer Palmer added that a neighbor referred to Sherbert Maddox's boyfriend by the nickname of "Disco," who was thereafter identified as defendant.

According to Officer Palmer, Mr. Maddox indicated that the relationship between defendant and Sherbert Maddox had been "volatile" in the past and that "there had been an instance where a gun had been pulled on her."   Officer Palmer added that there were two women (possibly related to Sherbert Maddox) present with Mr. Maddox during the conversation with him; in the course of the brief conversation, the two women indicated that they were concerned about the well-being of Sherbert Maddox because they also had not heard from her in several days.

Officer Palmer also testified that Mr. Maddox had stated that, once they entered the apartment complex, "the apartment that they were looking for was on the third floor."

---

[2]     On cross-examination, Officer Palmer stated that Mr. Maddox "had received the call from somebody he worked with."

Officer Palmer testified that, after speaking with Mr. Maddox and after taking into account what the two women had indicated, he and other officers of the Providence Police Department entered the apartment complex at 43 Parkis Avenue to carry out a "well-being check" concerning Sherbert Maddox. Officer Palmer stated that, in order to gain entry into the apartment complex, the officers knocked on the front door of the building and were let in by a resident of the first floor. Officer Palmer testified that, at approximately 1:45 in the morning, he and other officers went to the third floor of the apartment complex. He stated that there were two apartments on that floor—Apartment 5 and Apartment 6—and that he and the other officers first went to Apartment 5. Officer Palmer testified that the officers spoke with the resident of that apartment and conducted a "sweep" to "make sure he wasn't involved in any way." According to Officer Palmer, the resident of Apartment 5 stated that a male lived in Apartment 6 and that he had seen that male as well as a female "come in and out of that apartment" in the past. The resident of Apartment 5 further indicated to the officers that he had not seen either of those persons come out of Apartment 6 "within the last few days."

It was Officer Palmer's further testimony that, after speaking with the resident of Apartment 5, the officers "focused [their] attention on to Apartment 6." Officer Palmer testified that the officers then "began knocking, announcing [themselves] as police, trying to make contact with anybody in that apartment, to no answer." He

- 6 -

recalled that he had gone down to his cruiser and "tried to put [Sherbert Maddox's] name into [the] system," but he said that he had not been "able to get any information of value" by doing so. Officer Palmer stated that, at or around 2:04 in the morning after he had completed the just-referenced search for information, Patrolman David Palumbo told him that "he had seen somebody through the window of [Apartment 6] look out, see us and then go back inside." Officer Palmer stated that, once he returned to the third floor of the apartment complex from his cruiser, he and the other officers "proceeded to knock harder, again announcing that [they] were the police * * *." He testified that they did not make contact with anyone inside the apartment at that point. He also stated that the officers could hear "some sort of TV in the background" of the apartment. Officer Palmer indicated that this was not "a normal check of well-being," and he further noted the following:

> "I think because of the specifics of the information that Mr. Maddox had given us, because we knew that somebody was in the apartment, we had heard noise coming from there, it was something more than just a suspicion I think. So our senses were a little bit heightened at that point, yes."

Officer Palmer stated that, upon realizing that the individual inside Apartment 6 was not going to answer the door, the officers contacted the "shift commander," Lieutenant Robert Papa. He added that they notified Lt. Papa of the ongoing situation and asked how to proceed. Officer Palmer testified that Lt. Papa came to the scene and that it was then decided that they "were going to forcibly enter the

apartment * * *." He stated that, at or around 2:19 in the morning, he and the other officers entered the apartment using a battering ram, announcing themselves as the police, and breaking down the door in order to make entry. Officer Palmer stated that, upon entering the apartment, half of the officers went to the right side, while he and the other officers went to the left. Officer Palmer added that they observed a male sitting at the kitchen table and that officers went and "patted him down * * * for weapons and detained him." He testified that, at that time, he and other officers conducted a sweep of the apartment; but he added that that sweep did not reveal any other persons or any "threats" in the apartment. Officer Palmer stated that, when he entered the bedroom, he observed a refrigerator in that bedroom with a "stand-up fan" pointed at it and a "bungee cord" wrapped around it. He recalled that he quickly realized that the refrigerator was "out of place" because it was in the bedroom rather than the kitchen.

Officer Palmer testified that, once the refrigerator was opened, he observed that the shelves of the refrigerator had been taken out. He added that, when looking inside the refrigerator, he noticed that there was a large object in it that had been wrapped "in some sort of blanket." It was Officer Palmer's testimony that, when the door was opened, he detected the odor of what could "only be described as the smell of a dead body."

On cross-examination, Officer Palmer stated that, while conversing with Mr. Maddox, he learned that Mr. Maddox's niece had at some point resided at Amos House. He acknowledged that, to the best of his knowledge, no officers checked for her at that facility or otherwise attempted to contact her before going to 43 Parkis Avenue. He further acknowledged that, when he arrived at the apartment complex, he did not hear any screams, cries, or suspicious sounds emanating from inside the complex. He also stated that he did not smell anything in "the main part of the building." Officer Palmer further stated that, to his knowledge, no residents had indicated that they had heard, smelled, or seen anything out of the ordinary during the days when Sherbert Maddox had not been in contact with the persons who had expressed concerns about her.

## 2. The Testimony of Sergeant Brian Murphy

Sergeant Brian Murphy of the Providence Police Department testified that he arrived at 43 Parkis Avenue around 1:37 in the morning of March 22. He recalled that, when he arrived at the apartment complex, Officer Rosado was speaking with several people outside of the complex, including Mr. Maddox. Sergeant Murphy stated that Officer Rosado had been informed that "a possible homicide * * * [had been] committed." He further testified that Mr. Maddox was concerned that his niece had possibly been harmed or murdered by her boyfriend. Sergeant Murphy

stated that they eventually made their way into the apartment complex in order to perform a well-being check concerning Sherbert Maddox.

Sergeant Murphy testified that, upon learning that Sherbert Maddox might be in Apartment 6, he and other officers began repeatedly knocking on the door of that apartment. He stated that, when he initially began knocking on the apartment door, he did not hear any noises; however, he added that he later heard what he determined to be a TV playing inside the apartment. Sergeant Murphy said that he further noted that the TV noise "progressively got louder the longer [they] were outside the door."

It was further Sgt. Murphy's testimony that, because he was the ranking officer on the scene at that time, it was his decision, at approximately 2:20 in the morning, that "it would be necessary to force entry into the apartment" based on all the information that was available to him at that time. He added that that decision was based on the possibility that Sherbert Maddox could have been "in danger, potential for other victims, if she had been possibly murdered, and potential that a crime scene could now be destroyed based on the obvious attempt to avoid making contact with us from the tenant." Sergeant Murphy further testified that he passed that information along to Lt. Papa, who then responded to the scene.

Sergeant Murphy testified that, upon making entry into Apartment 6, a male (later identified as defendant) responded "Yeah" when asked if there was anyone else present in the apartment. Sergeant Murphy recalled also seeing a "revolver with

the cylinder disengaged on the counter." According to Sgt. Murphy, Apartment 6 was eventually "secured," and a warrant for the apartment was sought.

On cross-examination, Sgt. Murphy confirmed that, when he entered the apartment building with the other officers, he did not hear any noises or encounter any smells that indicated that there was an ongoing emergency. He testified that he and the other officers were there to investigate the well-being or possible death of Sherbert Maddox. It was further his testimony that some of the information that he had previously received was to the effect that Sherbert Maddox was dead and inside a refrigerator. However, he further clarified that he was not sure that "she was dead."[3] Sergeant Murphy also testified that, due to the fact that "movement in the window" had been observed, he was unsure if "there was anybody else in the apartment at that time."

### 3. The Testimony of Lieutenant Robert Papa

Lieutenant Robert Papa of the Providence Police Department testified that, on March 22, 2022, he was the "shift commander of the patrol unit." He stated that he went to 43 Parkis Avenue around 2:00 in the morning after receiving a phone call from Sgt. Murphy. Lieutenant Papa recalled that Sgt. Murphy relayed to him "that he believed that the situation necessitated an entry into a certain apartment." He

---

[3] A subsequent autopsy disclosed that the cause of death was a single gunshot wound to the chest and that the manner of death was homicide.

confirmed that he agreed that, based on the information that he had received as well as Sgt. Murphy's assessment relative to the ongoing situation, entry into the apartment was necessary.

Lieutenant Papa testified that, once he was inside Apartment 6, he observed a refrigerator in the bedroom. He stated that, upon getting closer to the open refrigerator, he observed "several garments of wrappings" covering what he believed to be human remains and that there was a "[v]ery strong, foul odor consistent with human remains." Lieutenant Papa testified that, after photographs were taken of the scene, the apartment was secured until a warrant was issued.

On cross-examination, when asked whether "one of the patrol officers had exigent circumstances to enter an apartment, did they have to call you and get your approval before they did that?," Lt. Papa responded, "No." Lieutenant Papa noted, however, that it was "thorough" on the part of Sgt. Murphy to have sought his approval before entry into the apartment based on the circumstances with which he was confronted. Lieutenant Papa further testified that he had opened the refrigerator in order to locate Sherbert Maddox because there was an "urgent concern of her health and well-being * * *." According to Lt. Papa, he did not know whether Sherbert Maddox was dead or alive.

#### 4. The Testimony of Patrolman David Palumbo

The defense called Patrolman David Palumbo of the Providence Police Department to testify. Officer Palumbo testified that he was dispatched to the area of 43 Parkis Avenue "a little after 1:30 in the morning" on March 22, 2022 in order to conduct "a short investigation." He stated that a "short investigation" is terminology used to describe a situation where "someone is flagged down or they saw something suspicious that made them drawn into that area." It was Officer Palumbo's testimony that seven patrol officers were called to the apartment complex and that, when he arrived on the scene, Sgt. Murphy was "in charge." He stated that Sgt. Murphy directed him to "sit on the perimeter."

On cross-examination, Officer Palumbo stated that, while he was "watching the perimeter," he observed "an individual peeking out of the window" of Apartment 6. He stated that news of that observation was then radioed to Sgt. Murphy by another officer at approximately 2:05 in the morning.

#### B

#### The Trial Justice's Decision on the Motion to Suppress

After the hearing had concluded, the trial justice denied defendant's motion to suppress. In denying defendant's motion to suppress, the trial justice stated that he considered the act of "flagging down a police officer in the early morning hours * * * tantamount to a 9-1-1 call and an urgent cry for help." He further noted that

- 13 -

Officer Palmer met with Mr. Maddox, who expressed "great concern that he had been told that day by someone" that his niece had been killed by defendant. The trial justice also emphasized that the officers were aware that there had been a previous "volatile relationship" between Sherbert Maddox and defendant.

The trial justice emphasized that, although the officers could hear a TV playing inside Apartment 6, no one answered the door in spite of their persistent knocking, all of which "heightened their suspicions and their concerns." He further noted that Officer Palumbo had seen someone peeking out the window of Apartment 6 even though no one had responded to the knocking, thereby increasing the officers' concern. The trial justice also stated that the testimony from Lt. Papa and Sgt. Murphy established that they could not conclude that Sherbert Maddox was in fact dead even though there was some basis for concluding that she had been killed. Specifically, the trial justice stated: "What began as a so-called wellness check had now become much more of an urgent situation in the minds of two very experienced police officers who, between them, had almost three decades in law enforcement."

The trial justice stated that, in making his decision, he was guided by the fact that "there is a decidedly synergistic effect when considering the accumulation of all of the facts and circumstances and fair inferences which underscore the wise adage that the [w]hole is greater than its individual parts." He concluded that, when considering all of the information that the officers had learned and "all of the

subsequent circumstances which thereafter unfolded," the officers acted within their authority to enter the apartment. It was his view that the officers were in the midst of an emergent situation and that it was possible that, when they entered the apartment, they might have been able to "rescue a victim who was hopefully still alive * * *." He further found that, because the officers did not know whether Sherbert Maddox was alive or dead upon their entry into defendant's apartment, "immediately opening the refrigerator was therefore imperative."

## C

### The Trial and Sentencing

On May 9, 2023, a jury trial commenced in the Superior Court. On May 15, 2023, the jury found defendant guilty on four counts—namely, second degree murder, discharging a firearm while in the commission of a violent crime, and two counts of unlawful possession of a firearm. The defendant was sentenced by the trial justice on September 26, 2023. On September 29, 2023, defendant filed a timely notice of appeal.

## II

### Issue on Appeal

The defendant contends on appeal that, although the Providence Police entered his apartment without a warrant, there were no exigent circumstances to justify doing so. It is his contention that this was in violation of both the federal and

state constitutions and that the fruits of this alleged illegal search should have been suppressed.

## III

## Standard of Review

This Court has "stated that when reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Depina*, 245 A.3d 1222, 1226 (R.I. 2021) (internal quotation marks and brackets omitted). When this Court reviews the denial of a motion to suppress, "we are required to make an independent examination of the record to determine if the defendant's rights have been violated." *State v. Casas*, 900 A.2d 1120, 1129 (R.I. 2006) (internal quotation marks and brackets omitted). This Court has further made clear that, when we perform this independent examination, we "must view the evidence in the record in the light most favorable to the state." *State v. Gonzalez*, 136 A.3d 1131, 1145 (R.I. 2016) (internal quotation marks omitted). Accordingly, "we will reverse a trial justice's findings on a motion to suppress only if (1) his or her findings * * * reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *Id.* (internal quotation marks omitted).

# IV

## Analysis

On appeal, defendant contends that the Providence Police violated his "constitutional right to be secure in his home when they burst in with no warrant and no exigent circumstances that justified doing so." Specifically, defendant asserts that there was no longer a "crisis" to avert since the evidence established that Sherbert Maddox had been killed prior to the entry of the police. In addition, defendant contends that there was no evidentiary basis for believing that defendant was disposing of any evidence that would have justified a warrantless entry.

For its part, the state argues that the trial justice correctly denied defendant's motion to suppress because exigent circumstances justified the Providence Police's warrantless entry into defendant's apartment.

The Fourth Amendment to the United States Constitution states that "the right to be secure against unreasonable searches shall not be violated." *Marron v. United States*, 275 U.S. 192, 195 (1927). And it further declares: "No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." *Id.* (quoting U.S. Const. Amend. IV). The Supreme Court has made clear that "[i]n terms that apply equally to seizures of * * * persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that

threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586.

In recognizing the highly personal and private nature of one's home and the fundamental principle of protecting against unconstitutional invasions of the right to privacy in one's own home, this Court has adopted the Supreme Court's admonition to the effect that "when an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." *Gonzalez*, 136 A.3d at 1151 (brackets omitted) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)). We have stated that, in order for exigency to be established, the "ultimate test is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *Id.* (quoting *United States v. Adams*, 621 F.2d 41, 44 (1st Cir. 1980)). We have further stated: "Such immediate and serious consequences may be present if any of the following exist: the potential of the destruction of evidence inside a residence before a warrant is obtained; a risk that a suspect may escape; or a threat posed by a suspect, to the lives or safety of the public, the police officers, or the suspect * * *." *Id.* (internal quotation marks and brackets omitted). This Court has repeatedly stated that "whether circumstances rise to the level of exigency is determined by referring to the facts known to the police at the time of

the arrest. The police must have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action." *Id.* (deletion and brackets omitted) (quoting *State v. Gonsalves*, 553 A.2d 1073, 1075 (R.I. 1989)).

This Court is acutely aware that "police are in the emergency service business," which can often mean that officers are unable to engage in "protracted evaluation" due to evolving circumstances. *State v. Portes*, 840 A.2d 1131, 1137 (R.I. 2004). We are also mindful that those evolving circumstances can turn out to constitute an emergency, thereby thrusting the police into a position where they must determine whether the situation calls for a warrantless entry because of exigency. The facts of the instant case reflect just such a situation.

In this case, the police were first made aware of a potential emergency when officers, in the early morning hours of March 22, encountered at least three persons, including Mr. Maddox, who expressed concern to the officers about the well-being of Sherbert Maddox. The trial justice characterized the initial reporting as "tantamount to a 9-1-1 call" in that it was an "urgent cry for help." Although we need not pass upon the issue of how completely accurate in the abstract is the analogy drawn by the trial justice between the flagging down of a police officer and a 911 call,[4] we have no doubt that, in particular, Mr. Maddox's expression of concern about

---

[4] As will become clear *infra*, the totality of the circumstances provides a supportable basis for the finding of exigent circumstances for a warrantless entry under the emergency aid exception. Accordingly, although there are certainly

his niece to the police certainly alerted them to a potentially emergent situation. Just as occurs upon receipt of a 911 call, the police possessed knowledge that an individual could well be in danger, even mortal danger; and it would probably have been a dereliction of duty if they had not taken further steps to ensure the safety of Sherbert Maddox and possibly others who might also have been in the apartment. *See United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004) ("[T]he police must take 911 emergency calls seriously and respond with dispatch."); *Portes*, 840 A.2d at 1137 ("[A] 9-1-1 call is one of the most universally recognized means through which the police learn that someone is in a dangerous situation and needs immediate help."); *see also id.* at 1136 (explicitly expressing agreement with the trial justice that "the police would have been derelict in their duty not to enter [the] premises").

Charged with this information, the police appropriately began attempting a well-being check concerning Sherbert Maddox. The testimonial evidence demonstrates that even locating defendant's apartment was initially challenging. Once the police began knocking on the correct door, they were met with no answer.

---

circumstances where the flagging down of a police officer would be equivalent to a 911 call, we need not decide in this instance whether the actions taken in this case were in the strictest sense tantamount to a 911 call. We would note, however, that Mr. Maddox's expression of concern uttered directly to the police is of a higher order of reliability than would be an anonymous 911 call. *See State v. Portes*, 840 A.2d 1131, 1137 n.6 (R.I. 2004).

We are unpersuaded that the police acted unreasonably in continuing to pursue a well-being check given the information that had been relayed to them by Mr. Maddox and the two women. *See Portes*, 840 A.2d at 1137 (stating that it would have been "unreasonable for the officers to simply walk away from the unanswered door given the 9-1-1 call and other facts known to them").

In endeavoring to perform a well-being check with respect to Sherbert Maddox, the police became aware of suspicious behavior on the part of defendant. Officer Palumbo had observed an individual peeking out a window in the apartment in spite of the fact that no one had answered the persistent knocking of the police. The police also heard a TV playing inside the apartment, which Sgt. Murphy testified "progressively got louder the longer [they] were outside the door." As the trial justice found, these factual developments heightened the officers' suspicions and concerns. Accordingly, we perceive no error in the trial justice's determination that the officers found themselves in an urgent situation that would require action in order to, in the trial justice's words, "rescue a victim who was hopefully still alive * * *."

In sum, it is our opinion that the totality of the circumstances provided a basis for the police to conclude that there was an urgent need to protect others. *See generally United States v. Snipe*, 515 F.3d 947, 951-52 (9th Cir. 2008) ("Considering the *totality of the circumstances*, law enforcement must have an objectively reasonable basis for concluding that there is an immediate need to protect others or

themselves from serious harm.") (emphasis added); *see also United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006) (holding that "[t]he government, in order to satisfy the exigent-circumstances exception" must demonstrate that "there was a risk of serious injury posed to the officers or others that required swift action. * * * In reviewing whether exigent circumstances were present, we consider the totality of the circumstances and the inherent necessities of the situation at the time.") (internal quotation marks omitted). Accordingly, it is our definite view that the officers' actions—repeatedly knocking and, after receiving no answer, entering in order to perform a cursory search for any endangered or injured persons—was an objectively reasonable response under the circumstances. *See Gonzalez*, 136 A.3d at 1151-52 ("Police officers are often confronted with rapidly unfolding and often dangerous situations that must be evaluated in context and not with the eyes of the proverbial Monday morning quarterback.").

In a similar vein, it is also our opinion that defendant is misguided in contending that the prolonged length of time that transpired before the police forcibly entered Apartment 6 proves that the circumstances were not exigent. The record in this case clearly supports that any delay in entering the apartment was not due to an overly relaxed attitude on the part of the officers; rather, it was the result of a situation that continuously became more urgent as the police grew closer to deciding to forcibly enter the interior of defendant's apartment. We echo the trial

justice's statement that, "[w]hat began as a so-called wellness check had now become much more of an urgent situation in the minds of two very experienced police officers who, between them, had almost three decades in law enforcement." It is evident to us that the existence of exigent circumstances became clearer and clearer as the police persisted in the efforts to perform a well-being check concerning Sherbert Maddox.

Additionally, we are likewise unpersuaded by the defendant's argument that the trial justice erred in ruling that the opening of the refrigerator without a warrant was justified under the circumstances. Our reasoning in upholding the trial justice's ruling relative to the warrantless entry into the apartment applies equally to our determination that the warrantless opening of the refrigerator was reasonable. In both instances, it is our view that the officers had a reasonable belief that exigent circumstances existed, which called for swift action. First, we note that, when the police entered the apartment, the defendant indicated to the police that there was another person present in the apartment. However, the police did not observe anyone else in the apartment. We again emphasize that the police were in possession of knowledge that the defendant and Sherbert Maddox had a previous "volatile" relationship and that police were unsure whether or not she was still alive. Moreover, the testimonial evidence further established that the typical odor that is associated with human remains was not present until the refrigerator was opened. In

particular, the trial justice properly credited Lt. Papa's testimony that, before he opened the refrigerator, he was not sure if Sherbert Maddox was dead or alive. For these reasons, we discern no error in the trial justice's ruling that, because the police had no certainty as to whether Sherbert Maddox was alive or dead upon their entry into the defendant's apartment, "immediately opening the refrigerator was therefore imperative." *See Duquette v. Godbout*, 471 A.2d 1359, 1362-63 (R.I. 1984).[5]

# V

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

**Justice Long, dissenting.** Sometimes, adherence to constitutional imperatives leads to uncomfortable outcomes. In assessing the validity of the warrantless entry in this case, I recognize the high cost—to be borne most heavily by the family of Ms. Maddox—that suppression of the evidence recovered from Mr. Cooper's apartment would bring. I am also mindful, however, of a warning issued

---

[5] Because we have concluded that the police were justified in entering the defendant's home under the emergency aid exception in the pursuit of providing aid to Sherbert Maddox, we need not and therefore shall not address the issue of whether the police would have been justified in entering the apartment in order to preserve evidence. *See Grady v. Narragansett Electric Company*, 962 A.2d 34, 42 n.4 (R.I. 2009) (noting "our usual policy of not opining with respect to issues about which we need not opine").

by United States Supreme Court Justice William Brennan in a case involving the Fourth Amendment: "that the task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our commitment to protecting individual liberty and privacy." *United States v. Leon*, 468 U.S. 897, 929-30 (1984) (Brennan, J., dissenting).

Guided by Justice Brennan's reminder, and informed by recent pronouncements from the United States Supreme Court and the United States Court of Appeals for the First Circuit concerning the Fourth Amendment, I believe that the trial justice erred in denying Mr. Cooper's motion to suppress. I therefore respectfully dissent.

It is a basic principle of federal constitutional law that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). This presumption hinges on the understanding that all persons have the right "to retreat into [their] own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "Nevertheless, because the touchstone of Fourth Amendment analysis is 'reasonableness' the warrant requirement is subject to certain exceptions" where the exigencies of a situation

make a warrantless entry objectively reasonable. *Brigham City*, 547 U.S. at 403; *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). Many of those exceptions are uncontroversial: entry into a home to save occupants from a fire or to investigate its cause is reasonable; entry into a home to prevent the imminent destruction of evidence is reasonable; and entry into a home to engage in the pursuit of a fleeing suspect is, likewise, reasonable. *Brigham City*, 547 U.S. at 403. The exact character, contours, and nature of the exception at issue today—the emergency-aid exception—however, remain open to debate. *See generally Caniglia v. Strom*, 593 U.S. 194, 141 S.Ct. 1596 (2021); *see also State v. Case*, 553 P.3d 985 (Mont. 2024), *cert. granted*, ___ S.Ct. ___, No. 24-624, 2025 WL 1549773 (June 2, 2025).

In the core emergency-aid cases, the reasonableness inquiry is not especially complex. In 1978 the Supreme Court concluded that the Fourth Amendment did not allow police to enter and search an apartment based only on the fact that police were investigating a homicide, even though police may make "warrantless entries and searches when they reasonably believe that a person within [a home] is in need of immediate aid." *Mincey*, 437 U.S. at 392, 394. In *Brigham City*, the Court reiterated that police "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury"; and subsequently determined that police acted reasonably when they entered a home in which they witnessed underage drinking, a physical altercation where someone was

struck in the face hard enough to draw blood, and heard people yelling "stop, stop" and "get off me." *Brigham City*, 547 U.S. at 403, 406. In *Michigan v. Fisher*, 558 U.S. 45 (2009), the Court again determined that a warrantless entry was reasonable where police, responding to a report of a disturbance, found signs of recent injury outside the dwelling, and witnessed violent behavior inside a dwelling. *Fisher*, 558 U.S. at 48. In all of these cases, the government bore the burden to establish an "objectively reasonable basis for believing that a person within the house is in need of immediate aid." *United States v. Giambro*, 126 F.4th 46, 54 (1st Cir. 2025) (brackets omitted). Only when they did so could they clear the reasonableness hurdle required to justify their entry.

But in the close cases, like the one before us today, the question of reasonableness is much harder to answer. Just four years ago, in a case arising out of a police search in Cranston, Rhode Island, the United States Supreme Court vacated a decision of the United States Court of Appeals for the First Circuit that had relied on a so-called "community caretaking" exception to the Fourth Amendment. *Caniglia*, 593 U.S. at 198-99, 141 S.Ct. at 1599-1600. The members of the Supreme Court unanimously agreed that there is no "community caretaking" exception under the Fourth Amendment, but the decision nevertheless garnered three concurrences which largely focused on the fact that the emergency-aid exception, although not at issue in *Caniglia*, remained alive and well. *Caniglia*, 593 U.S. at 200,

141 S.Ct. at 1600 (Roberts, C.J., concurring, joined by Breyer, J.); *id*. at 200, 141 S.Ct. at 1600 (Alito, J., concurring); *id*. at 204, 141 S.Ct. at 1602 (Kavanaugh, J., concurring). The authors of each separate writing agreed that police "may enter private property without a warrant when certain exigent circumstances exist," and that those exigent circumstances could include "the need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. at 198, 141 S.Ct. at 1599 (internal quotation marks omitted); *see id*. at 200, 141 S.Ct. at 1600 (Roberts, C.J., concurring) (explaining that nothing in the *Caniglia* opinion is contrary to the exception recognized in *Brigham City* or *Fisher*). But the Supreme Court's several opinions offered little guidance on when, and under what circumstances, that emergency exception justifies a warrantless entry, highlighting just how difficult it is to balance the interests protected by the Fourth Amendment against the duty of law enforcement to assist injured persons. *See Caniglia*, 593 U.S. at 200, 141 S.Ct. at 1600 (Roberts, C.J., concurring). Indeed, Justice Alito explained that, because of the lack of precedential guidance on warrantless, nonconsensual searches of a home to determine whether a resident is in urgent need of medical attention, state and lower federal "courts may be required to grapple with the basic Fourth Amendment question of reasonableness" presented by those cases to determine the limit on the police prerogative. *Id*. at 203, 141 S.Ct. at 1602 (Alito, J., concurring). And, just six weeks later, in *Lange v. California*, 594 U.S. 295, 141

S.Ct. 2011 (2021), the Court reiterated that it has "repeatedly declined to expand the scope of exceptions to the warrant requirement to permit warrantless entry into the home." *Lange*, 594 U.S. at 303, 141 S.Ct. at 2019 (internal quotation marks omitted).

Therefore, any assessment of a warrantless entry under the emergency-aid exception begins and ends with a review of reasonableness informed by "common-law analogies and a commonsense appraisal" of what the Supreme Court and federal courts have determined to be justified entries. *See Caniglia*, 593 U.S. at 204, 141 S.Ct. at 1603 (Kavanaugh, J., concurring). In reaching my conclusion that the police entry in the case at bar was unreasonable, I am guided by a recent decision of the United States Court of Appeals for the First Circuit, *United States v. Giambro*, 126 F.4th 46 (1st Cir. 2025). There, the court reversed a district court's denial of Mr. Giambro's motion to suppress where police had forcibly entered Mr. Giambro's home after receiving a report from a local hospital that Mr. Giambro had informed his son Antonio that Antonio's mother, Arline, was deceased. *Giambro*, 126 F.4th at 49-50, 53. Antonio had visited his parents' home upon returning from vacation; Mr. Giambro first relayed this information to Antonio during the visit, and Antonio subsequently drove his father to the hospital over concerns for his father's mental health. *Id.* at 50. The hospital placed a non-emergency call to the police to interview Antonio, who again relayed these facts to the officers. *Id.* The court concluded that, while police may "enter a home without a warrant to render emergency assistance

- 29 -

to an injured occupant or to protect an occupant from imminent injury," the government still must justify its entry by establishing an "objectively reasonable basis for believing that a person within [the house] is in need of immediate aid." *Id.* at 54 (quoting *Fisher*, 558 U.S. at 47); *see also Caniglia*, 593 U.S. at 206, 141 S.Ct at 1604 (Kavanaugh, J., concurring) (stating that exigency permits "warrantless entries when police officers have an objectively reasonable basis to believe that there is a current, ongoing crisis for which it is reasonable to act now"). The First Circuit held, however, that police lacked sufficient evidence upon which to form an objective belief that Arline was still alive given that the only report they had heard was that she was already deceased. *Giambro*, 126 F.4th at 55. The First Circuit concluded that Antonio's report of a death, standing alone, did "not support a reasonable belief in an urgent, ongoing emergency" because there were no contrary facts suggesting that Antonio's mother might still be alive. *Id.* at 55-56; *see also Mincey*, 437 U.S. at 394. The First Circuit detailed that, despite the police officers' concerns, the objective facts available to them at the time they entered Mr. Giambro's home were that Antonio did not demonstrate any anxiety that his mother could still be alive, no medical or law enforcement personnel were summoned to the property before or after Antonio returned from vacation, no one had requested a welfare check, and there were no signs of recent violence at the residence. *Giambro*, 126 F.4th at 56. I acknowledge that *Giambro* is not on all fours with the present

case; I am nonetheless guided by its pronouncement that, while the emergency-aid exception allows warrantless entries in the "narrow set of circumstances" where an occupant requires medical assistance, "a report that someone has died cannot always satisfy this standard because the report of a death generally indicates that emergency assistance is no longer needed." *Id.* at 57. That is particularly true where "there were simply no facts * * * indicating that [the decedent] might still be alive, and thus no objectively reasonable basis for believing that she was." *Id.* at 58. *But see United States v. Richardson*, 208 F.3d 626, 631 (7th Cir. 2000) (stating that "[f]aced with a report that there is a corpse in a house, it is hard to see why it is objectively reasonable to search in the hopes of finding a person who is still alive" but concluding that warrantless entry to search for a dead body was permissible in part because evidence in the record established that the police department's practice was not to take as true every report of a dead person).

In the case at bar, we are tasked with deciding whether the Providence police violated Mr. Cooper's Fourth Amendment rights when they broke down the door of his home, ostensibly to determine whether Ms. Maddox was still alive. Based on the First Circuit's recitation of the Supreme Court's current emergency-aid rule, and their decision in *Giambro* when presented with similar facts, I am compelled to conclude that they did.

In reviewing a trial justice's denial of a defendant's motion to suppress, "we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Patino*, 93 A.3d 40, 50 (R.I. 2014) (quoting *State v. Cosme*, 57 A.3d 295, 299 (R.I. 2012)). However, where a defendant alleges that their constitutional rights have been violated, "this Court must make an independent examination of the record to determine if" their rights were, indeed, violated. *State v. Harrison*, 66 A.3d 432, 441 (R.I. 2013). In undertaking our analysis, we view the record in the light most favorable to the state. *Id.* Thus, we will reverse a trial justice's findings on a motion to suppress only if (1) her or his findings reveal clear error, and (2) "our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *State v. Grayhurst*, 852 A.2d 491, 513 (R.I. 2004) (quoting *State v. Garcia*, 743 A.2d 1038, 1044 (R.I. 2000)).

In assessing the trial justice's findings, we confine our review to the objective facts known to the officers at the time of their entry, rather than the subjective motivations of individual officers. *See Brigham City*, 547 U.S. at 398; *see also State v. Gonzalez*, 136 A.3d 1131, 1151 (R.I. 2016) ("We * * * isolate all reasonably reliable information collectively known to the officers at the time their challenged conduct occurred, without indulging hindsight * * * to determine whether an objectively reasonable officer, with identical information, could have concluded that

there were exigent circumstances.") (brackets and emphasis in original omitted) (quoting *Hegarty v. Somerset County*, 53 F.3d 1367, 1375-76 (1st Cir. 1995)).

As to the facts found by the trial justice, they reveal that the objective facts known to the officers at the time of their entry were as follows: at about 1:30 on the morning of March 22[1], 2022 an individual who was identified only by her last name flagged down an officer and expressed concern about events at 43 Parkis Avenue; when Patrolman John Palmer arrived at 43 Parkis Avenue, Mr. Maddox reliably informed him that he had been told earlier that day that his niece had been killed by defendant and placed in a refrigerator in Mr. Cooper's apartment; Mr. Maddox also told Officer Palmer that it had been about four days since he had seen or heard from his niece, with whom he typically spoke on a daily basis; Mr. Maddox further informed the officers that Mr. Cooper had been violent towards Ms. Maddox in the past, including pulling a gun on her, stabbing her, and beating her up. Once inside the building, the officers did not receive a response when they knocked and announced their presence at Mr. Cooper's door, but heard a television inside the apartment as they waited outside the door; and a patrolman outside of the apartment witnessed someone peer out of the window from Mr. Cooper's apartment. The officers further explained during the suppression hearing that they did not hear

---

[1] The trial justice erroneously found that the entry into Mr. Cooper's apartment occurred on March 16; the date is corrected here, and throughout, to accurately reflect the record.

screams, cries, calls for help, or perceive suspicious sounds or smells, or any blood, when trying to contact Mr. Cooper. The trial justice also found that Mr. Cooper's neighbor stated that he had not seen Mr. Cooper or his female companion for a few days.

As a threshold matter, I reject the trial justice's statement that an unnamed woman's effort to flag down police officers was "tantamount to a 9-1-1 call." Although the majority asserts that it takes no position on the trial justice's characterization of this interaction, its analysis tacitly endorses the trial justice's framing of the woman's efforts to contact police; this too I reject. There are salient differences between a chance encounter with an officer driving down the street in South Providence, as happened here, and an urgent communication to emergency services via the system designated as the primary method to communicate the need for immediate assistance (that is, by dialing 911). The latter frequently appears in exigent-circumstance cases because reasonable police officers understand that someone calls 911 only when they are in fear of imminent injury or are already injured and in need of assistance. *See State v. Portes*, 840 A.2d 1131, 1137 (R.I. 2004); *see also Giambro*, 126 F.4th at 56 (discussing importance of fact that Antonio had not placed an emergency call for aid while at his parents' home). The scant facts before us today regarding the efforts to flag down a police officer do not rise to the level of urgency communicated by placing a 911 call. That is not to say that Mr.

Maddox himself would not have decided to call 911 at some point after arriving at 43 Parkis Avenue and investigating Ms. Maddox's whereabouts, but the fact that he had not done so at the time that another person came in contact with police is relevant to understand the objective basis for the officers' belief in an ongoing crisis requiring immediate assistance.

Moreover, I cannot see how the objective facts known to the officers at the time of their entry justify their warrantless incursion into Mr. Cooper's apartment. Here, the police were reliably informed, by a person who had not called 911 despite receiving credible information that his niece was deceased, that Ms. Maddox was deceased and in a refrigerator. That information was corroborated by three subsequent pieces of information obtained by police during the course of their investigation: that Mr. Maddox, who typically spoke with Ms. Maddox every day, had not heard from her in four days; that there was a known history of significant violence in the relationship; and that Mr. Cooper's neighbor had not recently seen or heard Mr. Cooper or Ms. Maddox. Significantly, officers on the scene knew that Mr. Maddox had been informed that Ms. Maddox was in harm's way at some point either on March 21 or 22[2] but had not immediately called for emergency assistance—instead, he went to 43 Parkis Avenue in the early morning hours of March 22 to

---

[2] In my review of the body-worn-camera video provided in the record before this Court, I can hear at least one of the other women on the street with Mr. Maddox state "I know it wasn't today" when asked when she thought Ms. Maddox was killed.

investigate on his own. *See Giambro*, 126 F.4th at 50, 56 (determining that evidence of a similarly delayed effort to seek police assistance did not give rise to exigency). To my mind, an objectively reasonable officer with identical information would not conclude that there were exigent circumstances; the facts as known by these officers supported the conclusion (1) that the information Mr. Maddox had received at some point either on March 21 or 22 was accurate and (2) that Ms. Maddox was already deceased. *See Giambro*, 126 F.4th at 56.

Critically, in my independent review of the transcript of the suppression hearing and video from the body-worn-cameras at the scene, it is apparent that the officers also did not observe any signs of violence or disturbance that would have heightened their suspicion that violence had been or was being perpetrated. *See Brigham City*, 547 U.S. at 400-01; *Fisher*, 558 U.S. at 48. The facts surrounding the tumultuous and often-violent relationship between Mr. Cooper and Ms. Maddox were, no doubt, concerning, but it is also relevant that there was no record of Ms. Maddox making a call to police to report abuse or to relay any fear of Mr. Cooper. *See Giambro*, 126 F.4th at 56-57 (explaining that a lack of reports regarding the relationship between Arline and Mr. Giambro in police records weighed against concluding that a reasonable officer would think that exigent circumstances existed).

To the extent that any reasonable officer would have genuine concerns about Ms. Maddox based on Mr. Maddox's report, it is striking that the officers did not

- 36 -

take any steps to determine whether Mr. Maddox's report was reliable, or to determine whether Ms. Maddox was okay, before breaking into Mr. Cooper's apartment. *See Giambro*, 126 F.4th at 57. Indeed, the officers who responded on the night in question did not independently ask to see Mr. Maddox's phone, call the phone number that had reported that Ms. Maddox was deceased, call or send an officer to Amos House where Mr. Maddox stated Ms. Maddox lived, call out Ms. Maddox's name when they were inside the apartment building, or otherwise make an effort to contact Ms. Maddox or corroborate the story that Mr. Maddox had relayed. Although law enforcement does not have to conduct additional investigations "if the facts on hand already indicate an objectively reasonable basis to invoke the emergency aid exception[,] * * * officers may not ignore obvious and available options for gathering facts to determine if an emergency actually exists." *Id.* (internal quotation marks omitted); *see Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009) (concluding that officers must take steps to determine whether there is an emergency that justifies their entry in the first place if, on arrival, they lack reasonable grounds to believe an emergency exists). *But see Richardson*, 208 F.3d at 627-28, 631 (finding exigency under similar facts but where the report of a dead body was relayed through a 911 call during which the caller gave their real name, included more details about the crime, and where the court concluded that "[t]his is

not a case where the report indicated that the body had been languishing in the house for several days.").

For example, police investigated the allegation that Ms. Maddox was in Mr. Cooper's apartment, and, in doing so, called all seven units deployed in Mr. Cooper's neighborhood to the scene in order to secure the area, but they did not request even one of those units to drive the half-mile to Amos House to determine whether Ms. Maddox had been seen there in the preceding days. To be sure, police had information that required them to maintain their focus on the 43 Parkis Avenue address, but there was no suggestion that they were incapable of sending an officer to Amos House to check whether Ms. Maddox was there, and I cannot conclude that they had an objectively reasonable basis to believe there was a current, ongoing need for aid without verifying whether Ms. Maddox was in any other location than the apartment. *See Giambro*, 126 F.4th at 57.

Moreover, I am not persuaded by the reasoning, adopted by the majority, that Mr. Cooper's conduct after the police arrived at the apartment heightened any sense of urgency. Sergeant Murphy testified at the suppression hearing that Mr. Cooper was under no obligation to open the door when police knocked because the police did not have a warrant. This is correct. *See Kentucky v. King*, 563 U.S. 452, 469-70 (2011) ("[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open

the door or to speak.").  An individual who does not answer the door when they are under no legal obligation to do so does not create or heighten exigent circumstances through their conduct.  Reliance on this fact as an element of the exigent-circumstance analysis circumvents the very protection the Fourth Amendment is designed to safeguard.  Under these circumstances, I do not believe that a reasonable officer in these officers' position could conclude that Mr. Cooper's failure to answer the door, and his choice to leave his television on, made it any more likely that he was disguising some nefarious conduct that required their immediate entry.  Therefore, I cannot agree that his conduct constituted "suspicious behavior" that increased the urgency of the moment.[3]

Finally, I note that the trial justice, in considering the evidence presented, pointed to the fact that "Sergeant Murphy and Lieutenant Papa testified that they could not in any way conclude that [Ms. Maddox] was, in fact, dead and that, instead, they also had believed that she may well still be alive."  However, this analysis hinges on assessment of and reliance on the officers' subjective beliefs, as does the trial justice's conclusion that the officers were endeavoring to "rescue a victim who was *hopefully* still alive * * *." (Emphasis added.)  As the Supreme Court has

---

[3] This is particularly true given that there was conflicting testimony at the hearing on the motion to suppress regarding whether police announced their presence while knocking on Mr. Cooper's door prior to forcibly entering the apartment.

- 39 -

repeatedly instructed in the suppression context, the subjective beliefs of the officer are irrelevant to analyzing whether an officer's warrantless entry is reasonable.[4] *Fisher*, 558 U.S. at 47.

This is a very close case. It is made even more difficult because the report that Mr. Maddox provided to the police turned out to be correct. But, just as the majority warns that we cannot assess the reasonableness of a warrantless entry with the "eyes of the proverbial Monday morning quarterback," *Gonzalez*, 136 A.3d at 1152, so too must we resist the impulse to justify police entry because we know what they uncovered upon entry into the apartment. In undertaking our analysis of the constitutionality of the police entry in this case, I believe we must follow the standards elucidated by the United States Supreme Court and Federal Courts of

---

[4] Were this Court inclined to probe the subjective beliefs of the officers, my review of the record indicates that the officers had no subjective belief that there was a current ongoing emergency to which they were responding. For example, Officer Palmer stated that the police did not break down Mr. Cooper's door immediately upon identifying his apartment because they did not believe they had the legal right to do so. *See United States v. Giambro*, 126 F.4th 46, 56-57 (1st Cir. 2025) (pointing to suppression hearing testimony where responding officers denied any basis to believe a crime had occurred as relevant to the emergency-aid analysis). Additionally, Lieutenant Papa confirmed that a patrol officer who had exigent circumstances to enter a home would not have to call him to get his approval before doing so; but the officers investigating 43 Parkis Avenue, including Sgt. Murphy, called Lt. Papa and awaited his arrival to the scene before breaching the door. *But see United States v. Richardson*, 208 F.3d 626, 631 (7th Cir. 2000) (upholding police entry based in part on record evidence of police practice). To my mind, this is particularly persuasive evidence of the responding officers' subjective beliefs that there was no ongoing crisis.

- 40 -

Appeal with regard to the emergency-aid exception. The core information that the officers acted upon was Mr. Maddox's report that Ms. Maddox was deceased. Yet a "report that someone has died cannot always satisfy" the exigent-circumstances standard "because the report of a death generally indicates that emergency assistance is no longer needed." *Giambro*, 126 F.4th at 57. The additional information that the officers discovered while on the scene did not change that calculus or heighten the urgency of the moment because, viewed objectively, it merely confirmed what Mr. Maddox had heard. Consequently, I cannot conclude that the officers' warrantless entry into Mr. Cooper's apartment was justified under the emergency-aid exception; therefore, I would reverse the trial justice's decision to deny Mr. Cooper's motion to suppress the guns seized from his kitchen and Ms. Maddox's body found in the refrigerator.[5]

Accordingly, I respectfully dissent.

---

[5] Because I conclude that the trial justice erred in denying Mr. Cooper's motion to suppress on the grounds that the police lacked exigent circumstances to enter Mr. Cooper's apartment, I do not consider Mr. Cooper's statements, made to police upon their entry, regarding another person's presence in the apartment. I note, however, that the trial justice made no findings about Mr. Cooper's statement in his decision at the suppression hearing.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Nathan Cooper. |
| **Case Number** | No. 2024-38-C.A.<br>(P1/22-1873AG) |
| **Date Opinion Filed** | August 19, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Devon Flanagan Hogan<br>Department of Attorney General |
| | For Respondent:<br><br>Angela M. Yingling<br>Rhode Island Public Defender |